**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Jefferson Bank & Trust, Plaintiff,**

v.

**REFCO GROUP, LTD., Refco, Inc., Refco Capital Corporation, Refco Securities, Inc., and Kimberly Goodman, Defendants.**

No. Civ.A. 93–K–85.

United States District Court, D. Colorado.

Dec. 19, 1997.

Craig B. Shaffer, S. Kirk Ingebretsen, Dufford & Brown, P.C., Denver, CO, for plaintiff/petitioner.

Jack Weinberg, Graubard, Mollen & Miller, New York City, Edward W. Stern, Parcel, Mauro, Hultin & Spaanstra, P.C., Denver, CO, Kimberely Goodman, Grand Island, NY, for defendants/respondents.

## MEMORANDUM OPINION AND ORDER ON PENDING MOTIONS

KANE, Senior District Judge.

The Federal Deposit Insurance Corporation ("FDIC"), as Receiver for Jefferson Bank & Trust ("JBT"), pursues this action against Refco Group, Ltd., Refco, Inc., Refco Capital Corporation, Refco Securities, Inc. (collectively "Refco"), and Kimberley Goodman.[1]

FDIC seeks damages, including punitive damages, alleging they arise from Defen-

---

**1.** JBT was a bank chartered under the laws of Colorado, with its principal place of business in Lakewood, Colorado. On July 2, 1993, FDIC was appointed Receiver for JBT. At all relevant times, Refco Securities, Inc. was a New York corporation registered as a broker-dealer by the Securities Exchange Commission, the New York Stock Exchange and the National Association of Securities Dealers; Refco Capital Corporation was a New York corporation in the business of providing financing for affiliated companies and their customers; Refco Group, Ltd. was a Dela-

ware corporation and a holding company; and Refco, Inc. was a duly regulated futures commission merchant regulated by the Commodities Futures Trading Commission. In 1990 and 1991, Goodman was a registered representative of Refco Securities, Inc. At various times Goodman was also employed by Refco, Inc. and Refco Capital Holdings, Inc., both subsidiaries of Refco Group Ltd. FDIC's claims against First Interstate Bank of Denver, N.A. were dismissed with prejudice on March 28, 1996.

dants' conduct and that of certain of their employees or agents during the period December 1989 through December 1991 and resulted in substantial losses to and the ultimate failure of JBT.

In what remains of the Third Amended Complaint, FDIC asserts the following claims for relief [2]:

1. First, for violation of § 18–17–104(3) of the Colorado Organized Crime Control Act ("COCCA") against all Defendants;

2. Second, for violation of section 18–17–104(4) of COCCA against all Defendants;

3. Third, for civil conspiracy against all Defendants;

4. Fourth, for violation of §§ 11–51–125(3) and 11–51–604(4) of the Colorado Securities Act against Refco;

5. Ninth, for conspiring to commit or aiding and abetting false representation against all Defendants;

6. Tenth, for relief for false representations against all Defendants;

7. Eleventh, for relief for conspiring to commit or aiding and abetting fraudulent concealment against all Defendants;

8. Twelfth, for fraudulent concealment against all Defendants;

9. Thirteenth, for conspiring to commit and aiding and abetting breach of fiduciary duty against all Defendants;

10. Fourteenth, for breach of fiduciary duty against all Defendants;

11. Fifteenth, for conspiring to commit or aiding and abetting conversion against all Defendants;

12. Sixteenth, for conversion against all Defendants; and

13. Seventeenth, for breach of contract against all Defendants except Goodman.

In its answer, Refco denies the allegations in the Third Amended Complaint and asserts thirteen affirmative defenses. No counsel has formally entered an appearance on behalf of Goodman and she has not filed an answer to the Third Amended Complaint.

Jurisdiction is based on the diversity of citizenship of the parties, pursuant to 28 U.S.C. § 1332. In its answer to the Third Amended Complaint, Refco denies FDIC's averments that personal jurisdiction over Refco and Goodman is proper pursuant to Colorado Revised Statutes § 13–1–124(1)(a) and (b) because Refco has transacted business and committed one or more tortious acts within the State of Colorado.

### I. Pending Motions.

Upon removal of the case to this court, it was assigned to Judge Lewis T. Babcock, who entered a pretrial order on December 17, 1996. In January 1997, Judge Babcock recused himself and reassigned the case to me, vacating a hearing on pending motions and a six week jury trial. I address the pending motions in the following order:

I. Refco's Motion for Summary Judgment to Dismiss Each of Plaintiff's Claims 1, 2, 3, 4, 9, 10, 12, 13, 14, 15, 16 and 17 and the Parties' cross-motions for partial summary judgment on Seventeenth Claim for Relief;

II. FDIC's Motion for Partial Summary Judgment on Affirmative Defenses 5 through 10 and 13 through 16;

III. Refco's Cross–Motion to Bifurcate the Alter-ego Claims from the Main Action;

IV. Refco's Motion for Rule 11 Sanctions; and

V. FDIC's Motion for Leave to Call Steven Seelig as a Fact Witness.

### II. Factual Background. [3]

#### A. Background of Steven Wymer and Denman & Company.

In approximately 1985, Steven Wymer formed SDW Asset Management ("SDW") to conduct an investment advisory business. That company was succeeded by Denman & Company ("Denman"). In 1986, Denman registered as an investment advisor with the

---

2. The Fifth, Sixth, Seventh and Eighth claims for relief in FDIC's Third Amended Complaint have been dismissed with prejudice.

3. These facts are not necessarily undisputed nor comprehensive but are intended as a background to the pending motions. Relevant disputed factual issues are discussed in the context of specific motions.

Securities and Exchange Commission ("SEC"). Denman's successor, Institutional Treasury Management ("ITM") registered with the SEC in December 1990, and by December 1991 had approximately eighty active clients and managed assets totalling nearly $1.2 billion. Wymer was the president and sole stockholder of Denman and ITM and was principally responsible for all activities of those companies.

Denman, and later ITM, provided investment advisory services to institutional customers[4], principally municipal entities and financial institutions, by investing customers' funds in mid-range United States Treasury securities and related investment products. Denman's promotional materials and sales presentations described a trading approach which promised to surpass the yield a customer might otherwise receive by passively investing in the same Treasury securities. Customers were told Denman never took custody of customer funds or securities, third party custodial services were used to ensure proper controls and safekeeping of customer assets, and they could achieve the highest current return available while investing in securities backed by the credit of the United States Government or short-term money market instruments. Customers would be provided with monthly reports or "performance reviews" listing assets in the account and all transactions that had occurred during the reporting period.

In reality, Wymer was engaged in an ongoing scheme to defraud. In 1986, he began diverting and misappropriating customer assets to cover trading losses in other customers' accounts. To conceal this activity and encourage customers to place additional funds under its management, Denman employees prepared false "performance reviews" and trade confirmations which seemingly confirmed the enhanced returns Wymer reported.

**B.** *Denman's Involvement with Refco.*

In 1987, Kimberley Goodman, a registered representative of Refco Securities, Inc. ("RSI"), solicited Denman's brokerage business. RSI accepted Wymer's conditions for doing business, namely that RSI would extend credit lines for Wymer and his customers and allow Wymer to trade options on United States Treasuries in those accounts; all communications would be between RSI and Wymer; RSI could not have direct contact with Denman clients; and Wymer would be allowed to share in the premiums earned on options transactions in his customers' accounts at RSI. When RSI began opening accounts for Denman customers, Wymer provided it with copies of his form ADV, Denman promotional materials, and copies of management agreements for specific customers.[5]

On August 13, 1987, Wymer also forwarded to RSI an "investment advisor's letter" stating that Denman acted for a number of customers "with full discretionary power to invest on their behalf, including the execution of orders to buy and sell securities." This claim contradicted the information contained in Denman's Form ADV and promotional materials.

---

**4.** The parties, and indeed some cases, use the terms "client" and "customer" as if they were synonyms. Common usage has a degenerative effect that makes this confusion possible. Nevertheless, genuine conceptual error results from insouciance to the distinction. A customer is one who regularly or repeatedly makes purchases of, or has business dealings with a tradesman or business house. Perhaps to add panache to the relationship, tradesmen and business houses refer to their customers as clients and thus imply that their honorable callings are professions. A client, however, is one who employs or retains another to appear for him in court, to advise or assist or act for him in any legal matter. The term client necessarily assumes a fiduciary relationship; the term customer does not. *See* Black's Law Dictionary (6th ed.1990) or *Encyclopedia of Word and Phrase Origins*, (Hendrickson, N.Y.1977).

**5.** An investment advisor is required to file a Form ADV at the time it registers with the SEC. This document provides extensive information regarding the entity requesting registration, including financial information, number of customers (current and proposed), and nature of the advice and/or services to be provided. On the Form ADV, the investment advisor must state whether it manages customer accounts on a discretionary or non-discretionary basis and whether it has custody of customer securities and/or funds. The investment advisor must update and refile its Form ADV each year and after every name change.

On September 1, 1987, RSI prepared a new "investment advisor letter" for Wymer's signature, purportedly applying to all current and future Denman customer accounts, which stated that Denman had obtained all necessary agreements and authorization from its customer to issue instructions for transactions in securities. RSI did not attempt to verify the new authority Wymer claimed to have, or to reconsider the representations in that letter in light of conflicting information in Denman's promotional materials and Form ADV.

By August 1987, RSI allowed Wymer to claim whatever portion of his customers' option premiums he desired without revealing either the amount or percentage to his customers. In October 1987, RSI requested that Wymer obtain written authorization from his customers for payment of these "fees". Contrary to the authorization form, however, the fees were not paid from customer accounts but from funds held in an RSI account at Refco Capital Corporation ("RCC").

Also during this period, Wymer opened cash management accounts at RCC for several Denman customers, designating each as a subaccount under the SDW Management master account. RCC employees did not verify Wymer's authority to open accounts on behalf of his customers. Unbeknownst to JBT, such a cash management subaccount was opened on its behalf in March 1987. As with all other subaccounts, monthly statements and confirmations for the JBT subaccount were mailed only to Denman.

At Wymer's instance, RSI employees Goodman, Douglas Blair (a vice president of Refco Group, Ltd. and registered representative of RSI who ran an RSI trading desk which conducted over-the-counter options transactions and broker cash transactions in U.S. government securities), and Robert Dantone (an assistant trader on the RSI over-the-counter options desk and a registered representative assigned to certain house accounts) transferred funds between these RCC cash management accounts, thus commingling Denman customer funds.

By about May 1988, Blair feared that if Wymer's portion of the option proceeds con-tinued to increase, Denman customers might no longer be interested in these types of transactions and his desk might lose that business. He discussed Wymer's escalating fees with Phillip Bennett, the President of RCC, and other unusual activity in the Denman-management accounts. At Bennet's instruction, Blair suspended trading in the Wymer-managed accounts, met with RSI's outside counsel to discuss documenting the Denman accounts, and on May 18, 1988 prepared a memorandum "to the credit file" reflecting these concerns and noting that trading with Denman had been suspended until satisfactory documentation was received. Neither Bennet nor Blair, however, brought their concerns to the attention of any Denman customer.

In April 1988, Jeffrey Schwartz, RSI's compliance director, also concerned about the size of Wymer's fees and Denman customers' lack of awareness thereof, sent a letter to all Denman customers requesting each to confirm that it wanted the fee arrangement to continue. The letter enclosed a copy of an Authorization to Pay Funds from Securities Account each had signed authorizing RSI to pay Advisory Management Fees directly from the customer account to the Investment Advisor (Wymer), and requested each customer to resign the authorization. It did not mention the amount of fees Wymer had and was claiming, at that time as much as 80% of the premium on a single transaction. RSI did not receive re-signed authorizations from several Denman customers, including JBT. Nevertheless, there is no evidence that RSI ever paid these customers those portions of the premiums previously "allocated" to Wymer.

In May 1988, Blair visited Denman's office in California to ascertain that the internal controls, relationships and documentation were adequate and appropriate. Blair discussed the issue of Wymer's fees and the changes he wanted made to Denman's form management account. He did not review Denman's internal controls because his visit was cut short; he believed an SEC examiner was present at Denman's office doing an examination, and left the SEC examiner "to

dig into it." In fact, no SEC employee was present in Denman's offices in May 1988.

In a letter to Wymer dated May 27, 1988, Blair requested a copy of Denman's current ADV and indicated RSI would require modifications to Denman's form management agreement. He said RSI would prepare the proposed changes to the standard contract. RSI then received the document dated April 29, 1988, which stated Denman only managed customer securities portfolios on a non-discretionary basis and did not have custody over its customers' funds and securities.

RSI's counsel prepared modifications to Denman's form management agreement to govern Denman's relationship with its customers and the management accounts. The re-written agreement empowered Denman to act with full power and authority for the customer, thus directly contradicting the representations in its promotional materials and Form ADV. The new agreement also provided that if a customer wanted confirmations, monthly statements or other reports for its account to be sent directly to Denman, rather than to the customer itself, the customer was to execute a form to that effect. Although no such form was received by RSI from any Denman customer, it continued to send statements and confirmations only to Denman.[6]

### C. JBT's Involvement with Denman and Refco.

On or about March 17, 1988, pursuant to a written agreement between JBT and Denman, JBT retained Wymer for one year to act as its investment adviser over a portfolio valued at up to $3 million (the "First Wymer Agreement").

The First Wymer Agreement provided that Wymer could not make purchases or sales for JBT without its advance approval and that JBT's monies and securities were to be held in an account at a broker/dealer or custodial bank selected by JBT to which JBT would have sole title. Almost immediately after this agreement was executed and contrary to its terms, JBT permitted Wymer to make purchases and sales without its advance approval or involvement. Maurice Grotjohn, who was President of JBT from June 1988 through December 1991 and one of its directors and shareholders, was comfortable with this arrangement. JBT also permitted Wymer to select the broker/dealers through which trades would be made.

On December 7, 1989, JBT and Denman signed another management agreement (the "Second Wymer Agreement"). Its provisions defining the responsibilities of Wymer and JBT were virtually identical to those in the First Wymer Agreement, and were similarly ignored. Wymer made purchases and sales for JBT's account without its advance approval and selected brokers through which trades were made. JBT unquestioningly followed Wymer's instructions as to where to send its funds for investment.

On December 11, 1989, at the behest of Wymer, Grotjohn signed and returned to Wymer an RSI account application and RSI customer agreement to open an account at RSI for JBT. However, Wymer did not deliver JBT's account application to RSI until February, 1990, the first time JBT had an account at RSI. Neither Grotjohn nor anyone else at JBT communicated with anyone at RSI in connection with this transaction.

On December 13, 1989, pursuant to Wymer's direction to transfer funds under the Second Wymer Agreement, JBT wire-transferred $13,035,294.06 to Citibank for credit to RCC for "REFCO/ac—38523114 ... reference 3755." Kristin Caldeira, an accountant and employee of JBT, prepared the wire transfer form at the direction of Wymer. No one from JBT contacted anyone at Refco or Citibank to verify if these account numbers were JBT's account. In fact RCC account number 3755 indeed belonged to another Wymer customer, the City of Indio, California. JBT did not have an account at RCC until January 1990.

On December 21, 1989, Wymer advised JBT by fax that $3,055,132.21 would be wired

---

6. RSI inadvertently sent JBT monthly account statements for the first six months of 1990. After July 1990 it stopped doing so, one year before it obtained a purported "authorization" from JBT to send statements to Wymer. It is disputed whether Grotjohn, the JBT president, actually signed the purported authorizations.

back to it that morning and JBT received a wire transfer in that amount from RCC. No one at JBT objected to Wymer's initiation of this transfer of funds, nor inquired of any person at Refco as to how Wymer had been able to direct the withdrawal of monies from JBT's account.

In January 1990, JBT received a "performance review" from Denman for the prior month, to which were annexed documents purporting to be trade confirmations regarding purchases and sales made by Wymer on JBT's behalf. These phony confirmations were printed up by Wymer and Angela Chilles, Denman/ITM office manager and fixed income trader, and reflected the JBT account number to be 4444 rather than the number 385 23114 or 3755 as previously reported by Wymer. No one at JBT inquired about the discrepancies in the account number.

On January 3, 1990, at Wymer's direction, JBT wire-transferred $1,900,149.45 to Citibank for the benefit of RCC, for the account which in fact belonged to the City of Indio. JBT made a similar wire transfer for $5,035,-848.66 at Wymer's instance on January 16, 1990. In early February 1990, JBT received Denman's performance review for the previous months reflecting that JBT's account number at RSI was 4444 (rather than the Indio number in the wire transfers) and over $19 million had been wired to that account by JBT in the preceding 49 days.

On January 17, 1990, Wymer requested RCC to open an account for JBT, which he funded by wire transfer. On February 9, 1990, JBT signed an account opening document for the RCC account identifying Grotjohn and Caldeira as persons who were "authorized to make investments and withdrawals from" that account. In February 1990, Wymer opened a new account at RSI (no. 46806759) using the documentation JBT had signed in December 1989. RSI and RCC followed Wymer's instructions regarding JBT transactions.

On February 22, 1990, JBT received a wire transfer of $165,784.51 from RCC, which had been directed by Wymer. No one at JBT asked RCC who had initiated the transfer. On February 26, 1990, again at Wymer's

direction, JBT wire-transferred $9,261.05 to Citibank for "Refco/AC—385 23114 reference 3755" which was the City of Indio's account.

In March 1990, RSI sent and JBT received a statement of JBT's account for the month ending February 28, 1990. At about the same time, it received a performance review from Denman for the same period, together with purported copies of trade confirmations from RSI reflecting JBT's purported purchases and sales of securities.

The performance review was irreconcilable with the monthly statement for the same period. In addition to other differences, the RSI statement disclosed that, as of February 1990, JBT's account was a "new account" with a "zero" opening balance and a "zero" closing balance, whereas the statement showed that JBT's account had been opened before February and its portfolio of securities and funds amounted to over $16.5 million.

No one at JBT reviewed the RSI statement or attempted to reconcile it with the performance review. Accordingly, no one at JBT noticed the discrepancies or spoke to anyone at Refco about them. Nor did anyone at JBT inquire why it had not received statements and trade confirmations directly from RSI for the previous two months.

When Grotjohn received the performance reviews he glanced at them and filed them. He did not examine the monthly statements but sent them to Caldeira believing she would reconcile them against JBT's records. Caldeira did not in fact attempt to do so. She put them into a file with other statements from other brokers.

Grotjohn testified if someone at JBT had reviewed and reconciled the RSI statements, he would have been led to doubt the accuracy of Wymer's performance reviews and, had he realized Denman was reporting inaccurate information, he would have told Wymer to liquidate JBT's account immediately.

In the ensuing months, JBT continued to follow Wymer's instructions to wire-transfer its money to the Indio account number and a different account number which Wymer told Caldeira was JBT's new account number.

No one at JBT attempted to verify this information although no steps had been taken to close JBT's old account nor to open a new one.

At the end of March 1990, Denman sent a monthly performance review to JBT which showed its portfolio amounted to over $16.5 million. Also at the end of March, RSI sent JBT a statement of this account which showed a "zero" balance at the end of the month. Again, no one at JBT compared the two or discovered the discrepancies between them.

On April 4, 1990, Grotjohn had a breakfast meeting with Kimberley Goodman, who at that time was an RSI account representative. This was the only conversation he ever had with anyone at Refco (apart from possibly speaking with Goodman to set up this meeting) before December 11, 1991, when Wymer's fraud was discovered. Grotjohn testified they discussed the size of the account but was not sure if they had discussed when the account was opened, account activity between December 1989 and March 1990, or whether an exact dollar figure was put on the size of the account. There is no evidence Grotjohn and Goodman discussed JBT's RCC account at this meeting.

In the ensuing months, no one from JBT reviewed or reconciled Denman monthly performance reviews with the RSI monthly statements for April, May, June, or July 1990. Wymer continued to tell JBT to wire money and JBT complied. JBT wired funds to five different accounts, including accounts at Manufacturers Hanover Bank which Wymer said were in JBT's name. No one at JBT questioned the various account numbers and destinations. Although JBT did not receive any statement directly from RSI after the RSI statement for July 1990, no one at JBT noticed their absence or contacted RSI to inquire about their absence.

In preparation for an audit examination by the Federal Reserve Bank, Caldeira wrote to Wymer in September 1990 on behalf of JBT and asked him to confirm that "Refco Securities, Inc." had custody of $25 million in securities in safekeeping for JBT. Both Caldeira and Grotjohn testified they did not know the full names of any of the Refco entities and

that they believed they dealt with only one entity named "Refco."

Wymer responded "All assets held at Manufacturers Hanover Trust through the auspices of REFCO Government Securities for the sole benefit of JEFFERSON BANK & TRUST...." Although Caldeira believed JBT's securities were being held at RSI, she did not investigate how they purportedly had come into the possession of Manufacturers Hanover Trust. Nor did she ever send an audit confirmation to Manufacturers to verify Wymer's statement or inquire why JBT securities were being held under the "auspices of REFCO Government Securities" as distinguished from RSI.

### D. *Alleged Involvement of Refco Employees in the Fraud.*

According to Wymer, certain RSI and RCC employees assisted him by following his instructions to receive funds and securities into and send funds and securities out of his customer accounts at RCC and RSI, and to commingle assets in Wymer customer accounts. He testified he took RSI employees Goodman, Blair and Dantone into his confidence in 1988.

Wymer maintains he told Goodman he was trading in Denman customer accounts for his own benefit, that he was not reporting all trading activity or losses to his customers, and that he diverted funds from one customer account to another to cover those losses. He also says he told Goodman he was reporting fictitious transactions to enhance Denman's performance and creating false confirmations to conceal these fraudulent practices. He claims Goodman assisted him by completing and signing at his direction false audit confirmation reports and letters regarding the amount of cash and securities on hand at RSI, and on one occasion sending false account statements to a different customer.

According to Wymer, Goodman told him in late 1988 or early 1989 that she had decided to leave RSI's employ. Wymer testified he induced her to remain at RSI by promising to pay and paying her a clandestine salary of $100,000, giving her two Jaguar automobiles, a Mercedes–Benz and expensive jewelry, and

paying for some of her vacations. He claims he did not tell anyone at RSI or any other Refco entity he had taken Goodman into his confidence and that no one at Refco knew this was the case.

FDIC asserts Goodman assisted Wymer in defrauding JBT by signing and returning two audit confirmations falsely setting forth its account balance. She did this at the direction of Wymer, who supplied her with the amounts to be confirmed or reported. One of the two confirmations Goodman allegedly signed was addressed to Wymer in his California office and asked him, rather than any Refco entity, to confirm the status of JBT's funds in Wymer's hands.

Goodman was not employed in RSI's accounting department and had no authority to sign audit confirmations. Only persons employed in RSI's accounting department were authorized to sign such confirmations. There is no evidence, nor does FDIC claim, that anyone at Refco knew about any of these alleged acts.

Wymer testified he also took Doug Blair into his confidence after RSI inadvertently sent a confirmation to a Denman customer, and Blair told him the customer had called concerning the confirmation. Wymer told Blair he did not report all transactions to his customers and advised him to ensure the slippage of sending confirmations directly to them, rather than to Denman, did not recur. Wymer maintains he had a similar conversation with Dantone in late 1988 or early 1989, when Dantone asked him how he should respond to inquiries from a Denman customer concerning an RSI statement it inadvertently received.

According to Wymer, neither RSI nor RCC employees questioned his instructions, or refused to effect any transaction he directed. These included "loss cover" and "mark-up" transactions. Loss cover transactions entailed selling a security from a customer's account at RSI at market price. To complete the sale, Wymer would deliver into that account securities owned by a different customer against payment of an inflated price.

Thus, the account from which the securities originated received more for the securities than they were sold for that same day at Refco. Mark-up transactions involved purchasing securities in a customer account at RSI at market price. Wymer directed the RSI/RCC trading desk to deliver those securities at an inflated price to another customer's account at a third-party institution. The "mark-up" or price differential would be paid to Wymer or diverted to another customer account.

According to Wymer, RSI and RCC repeatedly allowed him improperly to transfer funds or securities from Denman customer accounts with the participation of Blair, Dantone, Goodman and RCC employees. Wymer was not listed as an authorized person on the RCC account application, which stated that Grotjohn and Caldeira were the only ones authorized to make investments and withdrawals from that account. It is FDIC's position that, due to the participation of Refco employees in Wymer's schemes, JBT had no way of knowing before 1991 that Wymer was diverting funds with the assistance of RCC/RSI, which did not mail statements and confirmations to it.

Wymer also testified Blair and Dantone assisted him in commingling customer funds. According to Wymer, he did not offer to or ever pay anything to either Blair or Dantone for their silence, nor did he tell them about Goodman's involvement with his activities.

By January 18, 1991, at Wymer's direction, JBT had wired a total of $32,472,039.82 net to accounts Wymer selected. On or about that date, JBT for the first time requested RSI to confirm it held securities in that account for JBT. Goodman purportedly signed such a confirmation on or about January 18, 1991.[7] On or about November 7, 1991, she also purportedly signed a confirmation that JBT had addressed and sent to Wymer at his office in Irvine, California, not to RSI.

---

7. Of the funds which JBT transferred to Wymer's control, all but $5,233,166.40 were transferred before January 18, 1991.

## E. *Collapse of the Fraudulent Scheme.*

In September, 1991, Blair informed Wymer that the SEC had requested from RSI documents relating to the account of City of Marshalltown, one of Denman's customers. According to Wymer, Blair knew Wymer had not been reporting all transactions in the Marshalltown account and that documents the SEC had obtained from Denman would not correspond to account statements in RSI's/RCC's possession. Wymer testified that, during telephone conversations and a visit to California, he and Blair discussed the possibility of creating false RSI/RCC documents to submit to the SEC.

In November 1991, after JBT had placed $44 million under Wymer's control and in order to demonstrate its liquidity to federal bank examiners, it directed Wymer to liquidate its entire portfolio and to wire the proceeds to JBT. On November 25, 1991, on Wymer's instructions, JBT wire-transferred $44,927,031.25 to JBT in Lakewood from JBT's RCC account, *i.e.*, the total sum Wymer had placed in that account. Promptly after retrieving this money, JBT returned it to Wymer, who reinvested it through Shearson Lehman.

On December 9, 1991, the SEC initiated a civil action against Wymer and ITM, alleging they had engaged in securities fraud with respect to their managed accounts. On December 10, 1991, Wymer's associate, Steen Ronlov, informed Grotjohn that Wymer had resigned and the SEC "was in." Grotjohn immediately instructed Shearson to liquidate JBT's holdings. Less than two hours before the SEC froze Wymer's assets on December 11, 1991, JBT received a wire transfer of $44,593,230.02 from Shearson. Shortly thereafter, Wymer was arrested.

On September 29, 1992, Wymer entered into a plea agreement with the United States Attorney's Office for the Central District of California. He agreed to waive his right to an indictment by a grand jury; to plead guilty to charges of one count of racketeering in violation of 18 U.S.C. §§ 1962 and 1963, three counts of securities fraud in violation of

15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b–5, three counts of mail fraud in violation of 18 U.S.C. § 1341, one count of bank fraud in violation of 18 U.S.C. § 1344 (arising out of his fraud on JBT), one count of obstructing justice in violation of 18 U.S.C. § 1344, and one count of obstructing justice in violation of 18 U.S.C. § 1505; and to provide a factual basis for such guilty pleas.

As part of the plea agreement, within a year of his sentencing the government would move to reduce his sentence depending in part upon his cooperation and his former customers' recovery of their losses. On February 2, 1993, JBT, represented by Grotjohn, entered an "Agreement of Accord and Satisfaction and Covenant Not to Sue" with Wymer, agreeing not to sue him or his family or collect any monies from them.

## III. *Standards for Summary Judgment.*

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

## IV. *Refco's Motion for Summary Judgment to Dismiss Each of Plaintiff's Claims 1, 2, 3, 4, 9, 10, 12, 13, 14, 15, 16 and 17, and Cross-motions for Partial Summary Judgment on Claim 17.*

Refco moves for summary judgment on the remaining claims for relief in the Third Amended Complaint.[8] I also address below the cross-motions for partial summary judgment on the seventeenth claim for breach of contract.

Refco seeks summary judgment on the grounds that JBT's conduct caused the damages which it allegedly sustained; New York Law governs the instant dispute; FDIC cannot sustain its Colorado Securities Claim; Refco did not violate COCCA; and FDIC cannot prove any factual basis for its common law claims. Both sides seek partial

---

**8.** By order dated April 11, 1996, Judge Babcock granted FDIC's motion to dismiss its eighth

claim for negligence.

summary judgment on the breach of contract claim.

### A. *Proximate Cause.*

■■■ Proximate cause is a question of fact except in "the clearest of cases." *Lyons v. Nasby,* 770 P.2d 1250, 1257 (Colo.1989). An act is the proximate cause of an injury if the act was a "substantial contributing cause" in bringing about the injury. *Rupert v. Clayton Brokerage Co.,* 737 P.2d 1106, 1112 (Colo.1987). A "substantial factor" is defined as conduct " 'of sufficient significance in producing the harm as to lead reasonable persons to regard it as a cause and to attach responsibility.' " *Berg v. United States,* 806 F.2d 978, 981 (10th Cir.1986) (quoting *Sharp v. Kaiser Found. Health Plan,* 710 P.2d 1153, 1155 (Colo.App.1985), *aff'd,* 741 P.2d 714 (Colo.1987)). If a defendant's conduct is "a substantial contributing cause of the injury, it is irrelevant to the causation analysis whether other factors ... also contributed to the injury." *Rupert,* 737 P.2d at 1112; *see Berg,* 806 F.2d at 982 (noting "[t]here can be several proximate causes of the same injury").

■■■ Refco argues JBT acted unreasonably in failing to detect the fraud and thus caused the damages it allegedly sustained by its own conduct. FDIC responds that Refco, through its own conduct and as co-conspirator in Wymer's scheme, caused the injury.

Suffice it to say that this is not the clearest of cases. Refco deemphasizes its relationship with Wymer and stresses the relationship between JBT and Wymer, while FDIC deemphasizes JBT's relationship with Wymer and focuses on Refco's four-year relationship with him. In so doing, both sides ignore substantial evidence in the record.

Wymer's conduct was indisputably one proximate cause of JBT's injury. However, the evidence establishes genuine issues of material fact concerning Refco's assertion that JBT acted unreasonably in failing to detect the fraud, and was a substantial contributing cause of the injury. Similar genu-

ine factual issues exist as to FDIC's allegations that Refco, through its own conduct and as co-conspirator in Wymer's scheme, was a contributing cause of the injury. Summary judgment on the issue of proximate cause is not warranted.

### B. *Choice of Law.*

Refco argues New York law governs the instant dispute pursuant to a choice of law provision in the RSI customer agreement Grotjohn signed on behalf of JBT, and RSI approved by opening an account for JBT. The first, second and fourth claims for relief under Colorado statutes must fail and the third claim for relief must be dismissed, Refco asserts, because no such causes exist under New York law. FDIC submits Colorado law applies to all claims because the RSI customer agreement was never approved by RSI and is thus unenforceable. Both parties assert the choice of law issue involves the interpretation of a written contract which can be decided as a matter of law. *Luna v. City & County of Denver,* 718 F.Supp. 854, 857 (D.Colo.1989).[9]

JBT submitted account opening documents to RSI in December 1989, including an Account Application and a separate Customer Agreement. There are two spaces on the Account Application for signatures. The first is for a "Customer Signature," and was signed by Maurice Grotjohn as President of JBT on December 11, 1989. (Mem. Supp. Refco's Mot. Summ. J., Ex. 95.) The second is for an "Account Executive" which was signed by Goodman, and the third is for an "Approved Refco Securities, Inc." which was signed by Richard Hanley. The application is silent as to choice of law.

On December 11, 1989, also on behalf of JBT, Grotjohn signed an RSI Customer Agreement which pertinently states:

> In consideration of Refco, Securities, Inc. ("Refco") acting as your broker and accepting one or more accounts for transactions in securities ... it is agreed with respect to all accounts, whether upon margin or otherwise, which you now have or

---

**9.** "[W]here ... the existence of a contract is at issue, and the evidence is conflicting or admits of more than one inference, it is for the jury to decide whether the parties have entered into a contract and whether a contract exists." *Luna,* 718 F.Supp. at 857.

may at any future time have with Refco, including from time to time closed and then reopened, as follows:

. . . .

11. *NEW YORK LAW TO GOVERN.* This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York.

. . . .

18. *ACCEPTANCE.* This Agreement shall not be deemed to be accepted by Refco or become a binding contract between you and Refco until approved by Refco.

(Mem. Supp. Refco's Mot. Summ. J., Ex. 96.)

Although Grotjohn signed the Customer Agreement, it contains no specific provision or space for the signature of a representative of RSI and was not in fact signed by such representative. FDIC argues that, in the absence of a signature by an RSI representative, the Customer Agreement was not deemed accepted nor did it become a binding contract between JBT and RSI, and the choice of law provision contained therein is therefore unenforceable. The crisp issue here is whether the Customer Agreement by its own terms allowed RSI to approve it simply by opening JBT's trading account, or whether it required RSI to indicate its approval directly on the Agreement itself.

■ " 'It is established that a signature is not always necessary to create a binding agreement.' " *City and County of Denver v. Adolph Coors Co.*, 813 F.Supp. 1476, 1480 (D.Colo.1993) (quoting *Presidential Motor Yacht Corp. v. President Marine, Ltd.*, 753 F.Supp. 7, 13 (D.D.C.1990)). It is also true that " 'the purpose of a signature is to demonstrate "mutuality of assent" which could as well be shown by the conduct of the parties.' " *Id.* (further citations omitted).

In arguing that the only way RSI could approve the Customer Agreement was by signing it, FDIC relies on *Franklin Interiors v. Wall of Fame Management Co.*, 510 Pa. 597, 511 A.2d 761 (1986). There however,

the formation of a valid contract "was *expressly* conditioned upon the *written* approval of Appellee." *Id.* 511 A.2d at 762 (emphasis added). Moreover, "[t]he Appellee, through its officers, "never entered its signature on the document to evidence approval as required by its terms." *Id.* Similarly, the other cases cited by FDIC each concerned a contract which specifically set forth the only manner in which it could be approved or contained other elements, e.g. spaces for the signatures of persons who failed to sign.

RSI's Compliance Manual required a principal to review, initial, and date all new account forms, including the Customer Agreement. FDIC claims the format of the Customer Agreement shows RSI intended to indicate its approval by referring to fields at the top of the Agreement which called for internal RSI codes for "Office Number," "Account Number," and the numerical reference to the registered representative assigned to the account. RSI responds its Compliance Manual and the internal use fields refer to "back office" functions which occur only after the customer's account has been opened and an account number as signed. FDIC also cites the preamble of the Customer Agreement, which provides: "In consideration of Refco Securities, Inc. ("Refco") acting as your broker and accepting one or more accounts for transactions in securities ... it is agreed ... as follows. . . ." This language, FDIC argues, suggests RSI had already agreed to act as JBT's broker and open a securities account for it, and had done so pursuant to the separate Account Application. Paragraph 18 provides the Agreement would not be "deemed accepted ... until approved by Refco." If RSI could have indicated its approval simply by opening an account, FDIC maintains, then paragraph 18, which contemplates some further affirmative conduct by RSI, would be superfluous. *See F.W. Woolworth Co. v. Petersen*, 78 F.2d 47, 48 (10th Cir.1935).

Refco maintains RSI's practice of not signing the Agreement is the norm within the securities industry, citing *Lester v. Basner*, 676 F.Supp. 481 (S.D.N.Y.1987). There, the broker/dealer, Bear Sterns & Co. did not

sign the customer agreement. The court enforced the agreement, noting that the "plaintiff's securities transactions had been processed by Bear Sterns in reliance upon the Customer's Agreement...." *Id.* at 483. As FDIC points out, however, there is no indication the agreement in that case, or those in the other cases cited, contained a condition precedent equivalent to that in paragraph 18 of the Customer Agreement at issue, *i.e.,* that the agreement was not binding unless approved by the broker.

■ In interpreting the contract I look to the Customer Agreement itself, and note that RSI created the condition precedent to its enforcement. The agreement was not extensively negotiated by two parties on equal footing. Rather, it was unilaterally scripted by RSI, and is closer to an adhesion contract. To the extent the Agreement is ambiguous regarding the manner in which it was to be approved, I construe the ambiguity against its drafter and hold RSI to the express language it chose. *See Stegall v. Little Johnson Assocs., Ltd.,* 996 F.2d 1043, 1049 (10th Cir.1993). I find, absent any indication of RSI's approval on the agreement, there was no approval and the choice of law provision is not binding.[10]

Because the choice of law provision is not binding, adopting Restatement principles I conclude Colorado law applies. *See Trier-*

*weiler v. Croxton & Trench Holding Corp.,* 90 F.3d 1523, 1536–37 (10th Cir.1996).

### C. *Colorado Securities Act.*

FDIC's fourth claim is for securities fraud pursuant to Colorado Revised Statutes § 11–51–125(3) and § 11–51–606(4),[11] under which it seeks to recover trading losses incurred when RSI sold securities to JBT on February 26, 1990, May 18, 1990 and November 18, 1991.

#### (1) *Primary Liability.*

Refco argues FDIC cannot prove any RSI employee violated the Colorado Securities Act.

#### a. *Damages.*

■ The Colorado Securities Act provides a buyer "may sue to recover the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security...." Colo.Rev.Stat. §§ 11–51–604(4) and 11–51–125–(3) (1987).

Refco asserts it is undisputed that each of the 22 U.S. Treasury securities Wymer purchased ostensibly for JBT were sold by Wymer for JBT, and the sales proceeds JBT received were greater than the consideration

---

10. Refco does not respond to FDIC's estoppel argument, asserting it made no such argument in its motion for summary judgment. Similarly, Refco does not respond to FDIC's "significant relationship" argument by not moving for summary judgment on this issue. I do not address these arguments in light of my conclusion based on the language of the Customer Agreement.

11. The Colorado Securities Act, which was effective on July 1, 1990, pertinently provides:

> Any person who recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11–51–501(1)(b) (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that such person did not know, and in the exercise of reasonable care could not have known of the untruth or omission is liable to the person buying the security....

Colo.Rev.Stat. § 11–51–604(4).
The statute in turn provides:
(1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

> ....
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...

Colo.Rev.Stat. § 11–51–501(b)
Section 11–51–125(3), which was effective until June 30, 1990, provided:

> Any person who offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement, in the light of the circumstances under which it is made, not misleading (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission is liable to the person buying the security from him.

it paid, *i.e.*, in each instance JBT profited. Based on these facts, it argues JBT suffered no damages.

■ FDIC seeks to recover $147,426 for trading losses incurred on three specific securities transactions when Refco sold securities to JBT on February 26, 1990, May 18, 1990 and November 18, 1991. In this regard it cites Exhibit 24, the Ferguson Affidavit and relies on that part of § 11–51–604(4) which states: "Damages are deemed to be the amount that would be recoverable upon a tender, less the *value of the security* when the buyer disposed of it, and interest at the statutory rate from the date of disposition" (emphasis added). Based on the plain meaning of the statute, FDIC damages are calculated according to the value of the security at the time it was sold. Accordingly, even though JBT may have sold the securities for an amount greater than the consideration it paid, it did not recover the full value of the securities and should be awarded the difference between "the amount that would be recoverable upon a tender" and the "value of the security" when it was sold.

Although the November 18, 1991 transaction was not specifically mentioned in the Third Amended Complaint, it states that the sales of securities by Refco to JBT "included but are not limited to the following. . . ." (Third Am. Compl. § 80 at 44.) In light of Refco's notice of this allegation, the omission of specific reference to the November 18, 1991 transaction is not fatal.

The other two transactions total $108,988. Refco asserts the Ferguson Affidavit is insufficient to create any issue of fact regarding the February 26, 1990 transaction and maintains the purchase confirmations (Exhs. 39, 41) show on that date JBT bought $12 million in U.S. Treasury Securities at a cost of $12,017,413.67. On that same day, JBT sold $7 million of the securities and received $7,010,157.98, and on February 28, 1990 sold the remainder for $5,015,037.98. Thus, JBT netted a profit of $7,782.29.

With respect to the May 18, 1990 transaction, Refco states JBT purchased securities for $5,029,977.80, which was delivered to First Interstate Bank–Denver and credited to JBT's account. On this transaction too, it argues, the Ferguson Affidavit is wrong.

I find FDIC has set forth specific facts through the Ferguson Affidavit showing a genuine issue exists for trial as to whether JBT suffered damages with respect to the three specified sales. This issue must therefore await trial.

 b. *False or misleading statement of material fact "in connection with" the sale of securities.*

■ To establish liability under Colorado Revised Statutes § 11–51–604(4) (1996). FDIC must show RSI made a misrepresentation, omission or misleading statement of material fact in connection with the offer or sale of securities to JBT. *See Sears v. American Entertainment Group, Inc.*, No. 94 C 0165, 1995 WL 23112, at * 4 (N.D.Ill. Jan. 19, 1995) (interpreting § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the Colorado Securities Act § 11–51–604); *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1102 (Colo.1995) (construing Colo. Rev.Stat. § 11–51–125(2), the predecessor statutory section to § 11–51–604(4)). To establish a claim under § 11–51–125(3), FDIC must prove RSI offered or sold government securities to JBT "by means of any untrue statement of a material fact or any omission to state a material fact. . . ."

Refco claims FDIC cannot satisfy the "in connection with" requirement because it cannot prove any Refco entity made a misrepresentation or misleading statement in connection with JBT's purchase of government securities. *See Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973, 977 (10th Cir.1996) ("[s]ince [d]efendants' allegedly deceptive conduct could not have had an impact on [plaintiff's] decision to sell his shares, [d]efendants' conduct was not 'in connection with' the purchase or sale of a security § 10(b)"); *Sears*, 1995 WL 23112, at * 4 ("a plaintiff must show a causal connection between his decision to buy or sell a security and the defendant's fraudulent conduct").

Refco maintains there is no evidence any Refco entity gave investment advice or made investment recommendations to JBT, nor that a JBT employee or officer contacted

anyone at Refco concerning a sale of securities to JBT. Rather, it asserts, RSI executed the sales of securities to JBT as instructed by Wymer and no JBT representative, other than Wymer, dealt with RSI regarding sales of securities to JBT. Moreover, Refco maintains it sent accurate monthly statements relating to sales of securities effected in JBT's RSI account directly to JBT or to JBT, care of Denman.

In *Sheldon Co. Profit Sharing Plan & Trust v. Smith,* 828 F.Supp. 1262 (1993), plaintiffs sued two broker/dealers for losses resulting from a theft of their funds and other fraudulent acts of their investment adviser, Smith. The claims hinged on the brokers' "alleged failure to know their customers, and to abide by the known terms and limitations of the Investment Management Agreement." *Id.* at 1270. The court found plaintiffs had transferred to Smith full authority to make investment decisions, that the broker/dealers fulfilled their duty by providing plaintiffs with accurate confirmation slips and monthly statements to Smith, there was no special relationship of trust between plaintiffs and the broker/dealers who had not advised them on investments nor recommended they hire the particular investment advisor. *Id.* at 1270–71. It further found there was no direct contact between plaintiffs and the broker/dealers nor proof of any actionable misrepresentations or omissions.

Similarly here, Refco asserts, JBT of its own accord entrusted the management of its funds to Denman, Refco was not party to JBT's management agreement with Denman, nor did it have supervisory authority over him. It maintains it fulfilled its duty by providing JBT and/or Denman accurate trade confirmations and account statements regarding the sales of securities to JBT.

With regard to FDIC's claim that Goodman confirmed Wymer's representations regarding JBT's account balance and provided JBT's auditors with audit responses falsely confirming securities belonging to JBT were being held by RSI, and did not disclose to Grotjohn that Wymer was involved in a fraudulent scheme, Refco argues such statements, if made, were not "in connection with" RSI's sale of government securities to JBT.

FDIC maintains Refco too narrowly construes the antifraud provisions of the securities laws, citing *United Int'l Holdings v. The Wharf (Holdings) Ltd.,* 946 F.Supp. 861, 868–69 (D.Colo.1996), denying summary judgment on a claim for securities fraud under federal and Colorado state law on the grounds that fraud need not go to the nature or value of the security to satisfy the "in connection with" requirement. *See also Perez–Rubio v. Wyckoff,* 718 F.Supp. 217, 236 (S.D.N.Y.1989) ("in connection with" requirement satisfied where accomplishment of the alleged fraudulent scheme is directly related to the trading process); and *Alley v. Miramon,* 614 F.2d 1372, 1378 n. 11 (5th Cir.1980) ("in connection with" requirement flexibly applied to require a nexus between the defendant's fraud and the plaintiff's sale of securities). At the time JBT opened its account, FDIC asserts RSI concealed, inter alia, the fact that Wymer had been engaged in "unusual activity" and "non-standard practices" in Denman-managed accounts at RSI, and failed to inform JBT that for eight months RSI had knowingly prepared false trade tickets and confirmations to conceal Wymer's option premium splits. It further notes RSI does not deny Goodman made false representations during her April 1990 meeting with Grotjohn and on audit confirmations returned to JBT's auditors and federal bank examiners.

In *Arst* the Tenth Circuit determined the alleged fraudulent nondisclosures were made after the sale of securities and therefore were not in connection with the purchase or sale of securities. 86 F.3d at 977. Even assuming Goodman's misrepresentations were made *after* JBT engaged in securities transactions, FDIC asserts, this does not negate the fact that RSI made previous misstatements and omissions which induced JBT to enter into specific securities transactions.

FDIC distinguishes *Sheldon* because there was no evidence those defendants had or should have had reason to believe the investment advisor was involved in misdeeds. 828 F.Supp. at 1270. It likens its claim to the facts of *In re Catanella & E.F. Hutton & Co.,* 583 F.Supp. 1388 (E.D.Pa.1984) where the defendant brokerage firm failed to dis-

close to new customers that its registered representative had been found liable in a civil proceeding for intentionally mishandling customer accounts, improper trading practices and breaching a variety of fiduciary duties. Hutton's failure to disclose the prior litigation "touched" all subsequent securities transactions because, had plaintiffs known of the previous fraud, they would not have chosen to deal with the representative. *Id.* at 1409.

Refco distinguishes *Catanella* because Hutton held a series of seminars for relatively unsophisticated investors designed to "package and sell Cantanella as expert and untarnished in his brokerage experience." *Id.* at 1410. Because Hutton made partial disclosure about Cantanella's prior experiences, it was obligated to disclose his conviction for securities fraud. In the present case, Refco asserts, there is no allegation it gave any investment advice to JBT, nor that any Refco employee had any communication with anyone at JBT concerning the sale of securities to JBT. Rather, FDIC admits Wymer was the sole JBT representative with whom RSI dealt regarding purchases and sales of securities for JBT's account.

■ The parties' attempts to distinguish the facts of the cases each other cites reflects that any finding concerning the "in connection with" requirement is fact specific. In *Richardson v. MacArthur*, the Tenth Circuit declined to limit liability under federal securities law § 10(b) or Rule 10b–5 to the "garden variety of securities fraud involving deceit as to the actual value of securities bought or sold." 451 F.2d 35, 40 (10th Cir. 1971). Rather, it recognized such a cause of action where the defendant refused to sign promised stock over to plaintiff on grounds the defendant had paid off plaintiff's loan. The court noted, "Rule 10b–5 is a remedial measure of far greater breadth than merely prohibiting misrepresentations and nondisclosures concerning stock prices. No attempt is made in 10b–5 to specify what forms of deception are prohibited; rather, all fraudulent schemes in connection with the purchase and sale of securities are prohibited." *Id. See also United Intn'l Holdings, Inc.*, 946 F.Supp. at 869.

Similarly, the Colorado Securities Act does not delineate what forms of deception are considered to be "in connection with" the purchase and sale of securities. As was the case in *United International Holdings*, this dispute essentially concerns the purchase and sale of securities. Again, Refco deemphasizes its own relationship with Wymer and accentuates that between Wymer and JBT, while FDIC deemphasizes JBT's relationship with Wymer and focuses on Refco's relationship with him. Given the Tenth Circuit's broad interpretation of the words "in connection with" and the fact specific determinations of the issue in the case law, factual issues preclude summary judgment regarding the "in connection with" requirement.

#### c. *Unjustifiable reliance.*

■ Under the Colorado Securities Act, a seller of securities cannot be held liable to the buyer if the buyer had knowledge of the alleged untruth or omission. *See Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1517 (10th Cir. 1983) (finding that at minimum a plaintiff may not reasonably or justifiably rely on a misrepresentation which is palpably false).

■ Moreover, "[j]ustifiable reliance is not a theory of contributory negligence; rather, it is a limitation on a rule 10b–5 action which insures that there is a causal connection between the misrepresentation and the harm." *Id.* The relevant factors to be considered and balanced in determining whether reliance is justifiable are:

(1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; (8) the generality or specificity of the misrepresentations.

*Id.* at 1516.

■ Assuming, *arguendo*, RSI made an untrue statement or actionable omission in connection with the sale of securities to JBT, Refco asserts as a matter of law, JBT knew,

or in the exercise of reasonable care should have known, of such untruth or omissions. It contends the inconsistencies between RSI's February through July 1990 monthly statements and Denman's performance reviews and the representations of Wymer and Goodman preclude a finding of justifiable reliance on JBT's part. As previously discussed in relation to proximate causation, whether JBT acted unreasonably by not detecting Wymer's fraudulent scheme and in relying on any misrepresentations or omissions relating to the scheme, involves complex factual considerations inappropriate for resolution on summary judgment.

#### (2) *Secondary Liability.*

 FDIC alleges RSI is liable under Colorado Revised Statutes § 11–51–604(5)(b) [12] as a "controlling person" of its employee Goodman, who allegedly violated §§ 11–51–604(4) or 11–51–125(3). Refco asserts, even if RSI were considered a "controlling person" of Goodman, the secondary liability claim would have to be dismissed because FDIC cannot establish that Goodman committed a primary violation. As discussed above, genuine disputed issues of material fact thwart summary judgment on the question of whether Goodman committed a primary violation of the Colorado Securities Act. Summary judgment on the issue of secondary liability is therefore also precluded.

In a footnote, Refco requests reconsideration of Judge Babcock's decision that respondeat superior liability applies to claims brought under the Colorado Securities Act. *See FDIC v. First Interstate Bank of Denver,* 937 F.Supp. 1461, 1473 (D.Colo.1996). Under the law of the case doctrine, I regard Judge Babcock's determination of the issue as binding because Refco makes no showing of controlling contradictory authority nor that the ruling was clearly erroneous. *See Major v. Benton,* 647 F.2d 110, 112 (10th Cir.1981).

#### D. *Colorado Organized Crime Control Act ("COCCA").*

FDIC's first claim is under COCCA section 104(3), which states:

> It is unlawful for any person employed by or associated with, any enterprise to knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity....

Colo.Rev.Stat. § 18–17–104(3) (1997). Its second claim is under COCCA section 104(4), which makes it "unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (1), (2), or (3) of this section." Colo.Rev.Stat. § 18–17–104(4) (1997).

#### (1) *Primary COCCA Violations.*

 COCCA, Colorado Revised Statutes § 18–17–104(3) (1997), is modelled on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). To state a primary violation of COCCA section 104(3), a plaintiff is required to prove the defendant (1) through the commission of two or more predicate acts (2) which constitute a pattern (3) of racketeering activity (4) directly or indirectly conducted or participated in (5) an enterprise and (6) the plaintiff was injured in its business or property by reason of such conduct. *See FDIC v. First Interstate Bank,* 937 F.Supp. 1461, 1471–72 (D.Colo.1996) (holding the difference between COCCA and its parallel federal provision 18 U.S.C. § 1962(c) to be insignificant).

#### a. *Direct or Indirect Conduct or Participation.*

 It is uncontroverted that Wymer, through Denman, operated a Ponzi scheme by soliciting and entering into investment management agreements with his customers, taking control of their assets, misappropriating or converting such assets to his own use, and issuing false performance reviews and other phony documents to hide the scheme

12. That section provides:
 Every person who, directly or indirectly, controls a person liable under subsection (3) or (4) of this section is liable jointly and severally with and to the same extent as such controlled person, unless such controlling person sustains the burden of proof that such person acted in good faith and did not, directly or indirectly, induce the act or acts constituting the violation or cause of action.
 Colo.Rev.Stat. § 11–51–604(5)(b) (1997).

and create an appearance of profitability for his customers. Certain RSI employees are claimed to have assisted Wymer. Even if such activities occurred, Refco argues, controlling case authority establishes it did not violate COCCA § 18–17–104(3) because it did not play a role in directing the affairs of a COCCA enterprise.

In *Reves v. Ernst & Young,* 507 U.S. 170, 177, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993), the issue was the meaning of the phrase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" in 18 U.S.C. § 1962(c). The Court concluded "as both a noun and a verb in this subsection 'conduct' requires an element of direction." *Id.* at 178, 113 S.Ct. at 1169–70. "Participate," the Court said, required some part in that direction. *Id.* at 179, 113 S.Ct. at 1170. Thus, " 'to participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.* The phrase "directly or indirectly" made it clear that RICO did not require significant control over or within an enterprise, but only some part in directing the enterprise's affairs.

The *Reves* Court concluded liability did not lie under § 1962(c) unless one has "participated in the operation or management of the enterprise itself." *Id.* at 183, 113 S.Ct. at 1172. It adopted the "operation or management" test, limiting RICO liability to those "who participate in the operation or management of an enterprise through a pattern of racketeering activity." *Id.* at 183–84, 113 S.Ct. at 1172–73. It concluded the plaintiffs had not satisfied the "operation and management" test despite the fact that the defendant accounting firm, hired to perform an audit of a cooperative's records, had reviewed a series of completed transactions and certified the records fairly portrayed the cooperative's financial status as of a date three to four months preceding the meetings at which it presented its reports. The accounting firm failed to tell the cooperative's board it was insolvent if one of its assets was given its fair market value and not valued based on the cooperative's investment therein. This failure on the part of the accounting firm did not give rise to liability under § 1962(c) because it did not amount to participation in the operation or management of the cooperative. *Id.* at 186, 113 S.Ct. at 1173–74.

Refco urges *Reves* and its progeny have held persons and entities who knowingly and fraudulently provide services that promote, perpetuate or conceal an illegal scheme being conducted by or through an illegal enterprise cannot, on the basis of such acts, be deemed to have played a role in directing the affairs of the enterprise or to have participated in its management or operation. Fraudulent conduct consisting of no more than rendering services to, promoting, perpetuating or concealing the existence of a RICO scheme does not suffice even if some level of decision-making is involved. *See Reves,* 507 U.S. at 178–186, 113 S.Ct. at 1169–74. Thus, the acts of which RSI's and RCC's employees are accused, receiving funds and/or securities into and sending funds and/or securities out of Wymer customer accounts at RSI and RCC, commingling assets in Wymer customer accounts, making false representations regarding the size and performance of JBT's RSI account, and signing and sending false audit confirmations, all at Wymer's direction, do not rise to the level of operation or management of the enterprise through which Wymer conducted his scheme; *i.e.,* did not satisfy the COCCA requirement of conducting or participating in the enterprise.

Unlike the outside accountants in *Reves,* however, Refco had a longstanding involvement in relations between Denman and its customers. Moreover, material issues of fact exist as to whether Refco was an unwitting victim of Wymer's fraud or exerted control over the affairs of Denman/ITM.

FDIC has produced evidence demonstrating that in October 1987, RSI's compliance director drafted the investment advisor letter governing its relationship with Wymer until May 1988. Also in October 1987, after Wymer insisted upon the right to share in option premiums, RSI prepared the form that purportedly authorized those payments. Over the following eight months, RSI relied upon the authorization form it had drafted to pay Denman fees totalling more than $2.8 million.

In May 1988, when RSI became concerned over the ever-increasing size of the Den-

man/ITM fees and unusual activity in customer accounts, it prepared modifications to Denman's form management agreement and Wymer's investment advisor letter. The changes went directly to Denman's contractual relationship with his customers and Wymer's purported control over those accounts and in fact contravened· Denman's own Form ADV and promotional materials.

In May 1988, RCC required Wymer to discontinue his use of SDW Asset Management subaccounts and directed that each Denman customer open an individual cash management account. RCC disregarded the instructions on JBT's customer account application and gave Wymer unlimited discretion to transfer funds from JBT's cash management accounts.

In his earlier decision denying Refco's motion to dismiss, Judge Babcock held the factual allegations set forth in the Third Amended Complaint were sufficient to satisfy the *Reves* requirement. *First Interstate Bank*, 937 F.Supp. at 1472. FDIC has supported the allegations enumerated in that decision with admissible evidence, which, coupled with the evidence outlined above, creates a material issue of disputed fact as to whether Refco directly or indirectly conducted or participated in the fraudulent enterprise.

b. *Association-in-fact Enterprise.*[13]

 The Tenth Circuit has held "the existence of an enterprise is proved ʼby evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.ʼ " *United States v. Sanders,* 928 F.2d 940, 943 (10th Cir.) (quoting *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981)), *cert. denied,* 502 U.S. 845, 112 S.Ct. 142, 116 L.Ed.2d 109 (1991). A COCCA enterprise must entail "an ongoing organization with a decision-making framework or mechanism for controlling the group." *Id.* (citing *United States v. Riccobene,* 709 F.2d 214, 222 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)). The pattern of racketeering and the

enterprise are separate elements of a RICO violation. *Id.*

FDIC has alleged two alternative enterprises: a "Denman/ITM" enterprise (3d Am. Compl. ¶ 56) and an association-in-fact enterprise consisting of "Wymer, the Refco Defendants, Goodman and others," (*id.* at ¶ 57). It maintains this association-in-fact existed from at least as early as December 1989 through December 1991 and was an ongoing informal organization directed by Wymer in which Refco, through its employees including Goodman, performed continuing roles that furthered the enterprise. *Id.* The enterprise existed for the purpose of effecting investment transactions on behalf of or in the name of Denman/ITM customers and took all actions necessary to consummate such transactions. *Id.* As such, the complaint alleges, the enterprise was an entity separate from the alleged racketeering activity.

Refco argues FDIC cannot concoct an associated-in-fact enterprise among Wymer, Goodman and unidentified individuals together with Refco because such grouping lacks the organizational control mechanisms required by *Sanders; i.e.,* there was no structure or apparatus by which Refco was able to control Wymer and *vice versa.* It also relies on *Chang v. Chen,* 80 F.3d 1293, 1295 (9th Cir.1996), where the court, interpreting the Supreme Court's decision in *Turkette,* held a RICO enterprise must have an ascertainable structure separate from the structure inherent in the conduct of the pattern of racketeering activity.

In *Chang,* the plaintiffs alleged an association-in-fact composed of several individuals and a real estate brokerage company. According to the scheme, the Gabrych defendants would secure an option and enter into a first escrow to purchase land. Defendant Lin, acting as a sales agent for a real estate brokerage firm, would induce potential buyers to invest in the same parcel by making fraudulent representations and then sign a purchase agreement on behalf of the broker-

---

13. COCCA defines "enterprise" as "an individual ... corporation ... or other legal entity or any ... group of individuals, associated in fact al- though not a legal entity...." Colo.Rev.Stat. § 18–17–103(2) (1997).

age firm listing the Gabrych defendants as sellers.

An unknowing buyer would then make a nonrefundable deposit into a second escrow without being informed of the existence of the first escrow. In certain instances a "straw man" would be used to purchase the property at an inflated price just before the closing of the second escrow in order to conceal the property's true value from the purchaser. More than thirty transactions were alleged to have been conducted in this fashion.

While acknowledging that each defendant played a vital role in the scheme, the court found the roles played by the respective defendants failed to satisfy the minimum requirements necessary to establish an associated-in-fact enterprise. *Id.* at 1297, 1301. The requisite structure for making decisions and providing a " 'mechanism for controlling and directing the affairs of the group on an ongoing, rather than an ad hoc, basis.' " was lacking. *Id.* at 1299 (quoting *Riccobene,* 709 F.2d at 222).

Unlike *Chang* (decided on a motion to dismiss), where the complaint did not name the George Realty company as a defendant nor allege it participated in the racketeering activity, here FDIC alleges involvement of the Refco entities, each of which had an existence separate from its participation in the alleged racketeering activity. The *Chang* court recognized such involvement of a corporation can satisfy the enterprise element's requirement of a separate structure. *Chang,* 80 F.3d at 1300.

The Tenth Circuit has held the existence of an enterprise apart from the underlying pattern of racketeering and application of the *Riccobene* elements is a factual question for the jury. *Sanders,* 928 F.2d at 943 (deciding the issue of the existence of an enterprise post-trial). I find the factual record presents sufficient evidence from which a jury could find each of the *Riccobene* elements adopted in *Sanders* are satisfied. *See Sanders,* 928 F.2d at 943–44 (citing *Riccobene,* 709 F.2d at

221–22). Accordingly, summary judgment is inappropriate on the issue of the existence of an association-in-fact.

*(2) Secondary COCCA Violations.*

a. *Aiding and Abetting.*

FDIC alleges Refco, individually and through its employees, aided and abetted a violation of COCCA § 18–17–104(3), by knowingly assisting the wrongful conduct of Wymer and certain employees of Denman/ITM. (3d Am. Compl. ¶¶ 64–65.) Refco asserts, as a matter of law, a claim for aiding and abetting may not be imposed under COCCA § 104(3). In resolving the motion to dismiss, Judge Babcock already rejected this argument as "tenuous at best." *First Interstate Bank,* 937 F.Supp. at 1470–71. Refco makes no showing of controlling contradictory authority nor that the ruling was clearly erroneous. Absent such showing, Judge Babcock's determination of the issue is binding.

b. *Conspiracy.*

■ FDIC contends Refco is liable for conspiring or endeavoring to violate COCCA § 18–17–104(3) "by agreeing formally or tacitly, or by attempting to participate, directly or indirectly, in the fraudulent enterprise." [14] (3d Am. Compl. ¶ 69.) The COCCA conspiracy provision, like its federal counterpart, requires proof of two agreements, one "to a pattern of racketeering activity as defined by the statute, and another to the statutorily proscribed conduct." *See Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 990 n. 11 (10th Cir.1992). Refco maintains FDIC cannot show it agreed (1) to conduct or participate in the affairs of the unlawful enterprise and (2) to commit the predicate acts.

I have already denied summary judgment on the issue of whether Refco directly or indirectly conducted or participated in the fraudulent enterprise, the first requirement for liability under the COCCA conspiracy provision. I therefore consider only the sec-

---

**14.** COCCA provides: "It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (1), (2), or (3) of this section." Colo.Rev.Stat. § 18–17–104(4) (1997).

The only difference between the COCCA conspiracy provision and RICO, 18 U.S.C. § 1962(d), is the omission of "or endeavor to" in the federal analogue.

ond limb of the argument, namely whether Refco agreed to commit the predicate acts, *i.e.,* as "aware of the essential nature and scope of the enterprise and intended to participate in it." *See Baumer v. Pachl,* 8 F.3d 1341, 1346 (9th Cir.1993) (further quotation omitted).

According to Refco, it was unaware of the nature and scope of Wymer's unlawful enterprise and there was no intention on its part to participate therein. It notes occasions on which RSI and RCC employees provided accurate information to Denman/ITM customers by sending accurate monthly statements and/or trade confirmations inconsistent with fictitious reports prepared by Wymer.

FDIC argues Refco prepared and mailed misleading trade confirmations in connection with Wymer's option premium "splits" and, when some Denman customers received statements or confirmations directly from RSI, once such communications were discovered by Wymer or certain Refco employees, steps were taken to "rectify" the situation. The existence of any accurate records is thus overshadowed by the systematic pattern of improper transactions effected with the assistance of RSI/RCC employees.

I find disputes of material fact preclude summary judgment on the issue of whether Refco through its employees knowingly agreed to participate, directly or indirectly, in the affairs of the alleged enterprise.

### c. *Respondeat Superior.*

■ FDIC asserts Refco is vicariously liable pursuant to COCCA §§ 18–17–104(3) and 18–17–104(4) on the basis of *respondeat superior* because Goodman and other employees acted as its agents. (3d Am. Compl. ¶¶ 67, 73.) Judge Babcock held an employer may be liable on this basis where an employee's "actions constitute participation in the operation or management of the COCCA en-

terprise." *First Interstate Bank,* 937 F.Supp. at 1471. Again, Refco points to no binding authority that would lead me to a contrary conclusion. Moreover, there is sufficient evidence to give rise to genuine issues of material fact as to whether Goodman, Dantone, Blair and other Refco employees acted in the scope of their employment. Accordingly, summary judgment is inappropriate.

### (3) *Statute of Limitations.*

■ Because there is no express statute of limitations within COCCA, the two year general limitation of actions period established by Colorado Revised Statutes § 13–80–102(1)(i) (1997) applies.[15] *See Todd Holding Co., Inc. v. Super Valu Stores, Inc.,* 90 CV 362 (Dist.Ct. Weld Co. Feb. 20, 1995), *on writ of prohibition, Super Valu Stores, Inc. v. District Court, Weld County, Colo.,* 906 P.2d 72 (Colo.1995) (COCCA actions subject to the two year statute of limitations).[16]

■ *Indianapolis Hotel Investors, Ltd. v. Aircoa Equity Interests, Inc.,* 733 F.Supp. 1406, 1409 (D.Colo.1990), holds a RICO claim accrues for limitations purposes when a plaintiff knows or should have known of the existence of all elements of the claim, including the existence of a pattern. Refco asserts if, in the exercise of reasonable diligence, JBT had examined its RSI account statement for the period ending February 28, 1990, the COCCA claim would have been time-barred because JBT would have discovered Wymer had provided it with false and fraudulent performance reviews and had defrauded it of more than $19 million.

Even if this were the case, however, the receipt of such statement would not necessarily have placed JBT on notice that Wymer and (as alleged) Refco were engaged in a pattern of racketeering activity. Issues of material fact exist as to when JBT knew or

---

**15.** The pertinent provisions state:
 The following civil actions, regardless of the theory upon which suit is brought, or against whom suit is brought, shall be commenced within two years after the cause of action accrues, and not thereafter:

 . . . .

 (i) All other actions of every kind for which no other period of limitation is provided.

Colo.Rev.Stat. § 13–80–102(1)(i) (1997).

**16.** *But see Brooks v. Bank of Boulder,* 891 F.Supp. 1469, 1481 (D.Colo.1995) (impliedly holding the four-year limitations period applicable to RICO claims also applies to COCCA claims).

should have known of a pattern of racketeering activity causing injury. When the statute of limitations accrued in this case must therefore be left to the jury's determination.

### E. Civil Conspiracy Claim.

 To establish civil conspiracy under Colorado law, a plaintiff must show (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) an unlawful overt act, and (5) damages as to the proximate result. *Nelson v. Elway,* 908 P.2d 102, 106 (Colo.1995). Absent facts showing such meeting of the minds, the existence of a conspiracy will not be inferred, *id.,* although a tacit agreement may suffice. *Resolution Trust Corp. v. Heiserman,* 898 P.2d 1049, 1056–57 (Colo.1995). *See also First Interstate Bank,* 937 F.Supp. at 1473.

 FDIC claims there was a civil conspiracy among Wymer, First Interstate, and Refco wrongfully to divert assets belonging to the customers of Denman/ITM, including JBT.[17] Refco argues there is no evidence it agreed or was acting in concert with Wymer to accomplish an unlawful objective. As is the case in the COCCA conspiracy claim, disputes of material fact preclude summary judgment.[18]

### F. False Representation Claim.

### (1) Primary Liability for False Representation.

 The elements of the tort of false representation are 1) a representation (or omission) of a material fact, 2) which was untrue and known to be untrue, 3) offered to induce plaintiff to act, and 4) upon which plaintiff relied to his injury. *First Interstate Bank,* 937 F.Supp. at 1475. Refco asserts

FDIC cannot prove these necessary elements.

FDIC claims Goodman and Refco materially misrepresented the accuracy of information contained in letters sent to the Federal Reserve and other outside agencies or auditors conducting audits of JBT. It is unrebutted that Goodman purposely misrepresented the trading activity and balance in JBT's account at RSI during her April 1990 meeting with Grotjohn. There is also evidence that on two occasions in 1991, Goodman knowingly signed and returned audit confirmations which knowingly misrepresented JBT's account balance.[19]

Refco contends FDIC cannot establish, as a matter of law, that JBT justifiably relied upon any misrepresentations made by Refco. As previously discussed in relation to the Colorado Securities Act claim, material issues of fact preclude a determination as to whether JBT acted unreasonably by not detecting the fraudulent scheme.

Finally, Refco maintains FDIC cannot establish proximate causation as to those investments made before any misrepresentation by Goodman. In response, FDIC has limited the damages for this claim to the losses incurred on and after April 4, 1990, rendering this argument moot.

### (2) Aiding and Abetting False Representation.

 In *Holmes v. Young,* the court held: Liability for aiding or abetting a tortious act will be found if the party whom the defendant aids performs a wrongful act that causes an injury, the defendant is generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and

---

**17.** Refco asserts this claim is insufficient as a matter of law under both New York and Colorado law. Because I have already determined that Colorado law applies, I only consider the argument that there is no factual basis for the conspiracy claim under that law.

**18.** For the same reason, summary judgment is inappropriate on the ground of a failure to show a meeting of the minds on other claims based on a conspiracy theory, namely, the Ninth Claim for Conspiring or Aiding and Abetting False Repre-

sentations, Eleventh for Conspiring to Commit or Aiding and Abetting Fraudulent Concealment, and Thirteenth for Conspiring to Commit or Aiding and Abetting Breach of Fiduciary Duty.

**19.** Refco argues it cannot be held responsible under *respondeat superior* because Goodman was acting outside the course and scope of her employment. I have already found sufficient evidence exists to give rise to a genuine issue of material fact in that regard.

the defendant knowingly and substantially assists the principal violation.

885 P.2d 305, 308 (Colo.App.1994).

FDIC claims Refco conspired to commit or aided and abetted false representations.[20] It asserts Refco prepared and mailed misleading trade confirmations in connection with Wymer's option premium splits and that when some Denman customers received statements or confirmations directly from RSI, once such communications were discovered by Wymer or certain Refco employees, steps were taken to "rectify" the situation. It also refers to the following: (a) before December 1989 and the second management agreement with JBT, Blair, Dantone and Goodman knew Wymer was not reporting all trading activity and losses in his customers' accounts; (b) Blair's May 18, 1988 memorandum describing unusual activity in the Denman accounts; (c) RSI's efforts to conceal the option premium splits paid to Wymer in 1987 and 1988; (d) RSI's preparation of an investment advisor letter which contradicted Denman's Form ADV; and (e) RCC's decision to allow Wymer to direct transfers from customer accounts notwithstanding contrary instructions on the customer account application. Finally, it cites evidence showing that Goodman, through her representations to Grotjohn in April 1990 and the false audit confirmations she signed, lulled JBT into believing that its investments were secure.

Refco contends there is no evidence it had knowledge of or substantially assisted Denman's false representations to JBT, emphasizing RSI sent directly to JBT accurate account statements and confirmations that were inconsistent with Denman's representations, and asserting Goodman's knowledge may not be imputed to it.

Triable issues of fact exist with regard to the requisite elements of knowledge of and substantial assistance in the tortious activity required to establish an aiding and abetting claim.[21]

### G. Breach of Fiduciary Duty.

■ The elements of a claim for breach of fiduciary duty are: "1) the existence of a fiduciary relationship between plaintiff and defendant; 2) defendant's breach of the fiduciary duty; and 3) damages as a result of the breach." *First Interstate Bank,* 937 F.Supp. at 1476. The Colorado Supreme Court has held that the mere fact that there is a broker-customer relationship is insufficient to impose broad fiduciary duties upon the broker:

[P]roof of practical control of a customer's account by a broker will establish that the broker owed fiduciary duties to the customer with regard to the broker's handling of the customer's account. Evidence that the customer has placed trust and confidence in the broker, with the broker's knowledge, to manage the customer's account for the customer's benefit will be indicative of the existence of a fiduciary relationship but will not, by itself, establish that relationship....

Since proof of circumstances of control is necessary to elevate an ordinary broker-customer relationship to one that is fiduciary in nature, the question of whether the broker in a given case owes fiduciary duties to a particular customer must be resolved on a case-by-case basis.

*Paine, Webber, Jackson & Curtis, Inc. v. Adams,* 718 P.2d 508, 517 (Colo.1986).

■ FDIC asserts Refco breached its fiduciary duties of loyalty, good faith and care to its customer JBT, by, *inter alia,* not disclosing material facts concerning the securities transactions it effected on JBT's behalf, failing to maintain JBT's funds and securities in segregated custodial accounts and deposit wire transfers sent directly to JBT's investment account at RCC, and allowing withdrawals from JBT's account without proper authorization. Refco argues there was no fi-

---

**20.** As discussed above, material issues of disputed fact exist regarding the conspiracy claim.

**21.** Summary judgment is also inappropriate because a failure to show knowledge of the tortious acts or substantial assistance in the principal violation on the other claims based on an aiding

and abetting theory, namely, the Eleventh for Conspiring to Commit or Aiding and Abetting Fraudulent Concealment, and Thirteenth for Conspiring to Commit or Aiding and Abetting Breach of Fiduciary Duty are triable issues of fact.

duciary relationship between Refco and JBT, nor an assumption of control by or responsibility reposed in JBT, because (1) Refco did not recommend Wymer or Denman be hired as JBT's investment advisor, (2) JBT never sought advice of any kind from Refco; (3) Refco did not give advice or make any recommendation to JBT; (4) Refco had no discretionary authority over any JBT account; and (5) Refco acted merely as the instrument for executing the transactions directed by JBT's agent Wymer. Moreover, it asserts RSI and RCC fulfilled their duties of disclosure to JBT by providing accurate account statements and trade confirmations to JBT and/or Denman.

FDIC contends Refco did not merely execute orders but its employees functioned in an advisory capacity, providing Wymer with recommendations on the market and investments for his customers' accounts. RSI had notice of the disclosures in Denman's Form ADV and in May 1988 exercised its prerogative to ensure Wymer did not exercise discretion and custody over customer assets by temporarily suspending trading in the Denman accounts; and Refco exercised practical control over the accounts by drafting an investment advisor letter authorizing Wymer to act with full authority for his customers, thus giving him the ability to divert his customer's assets. The record also shows JBT placed considerable trust and confidence in RSI, believing its assets would be "custodialized" there and Goodman reinforced this belief during her April 1990 meeting with Grotjohn by extolling Wymer's abilities and verifying the performance of JBT's investments. FDIC finally asserts the audit confirmations Goodman signed and returned to JBT's outside auditors reinforced the confidence and trust placed in RSI.

Refco replies it is insufficient for JBT to have believed it had a custodial relationship with Refco. Rather, it must show that Refco knew JBT reposed trust and confidence in it to manage JBT's account for JBT's benefit and it knowingly assumed that duty. This, Refco argues, FDIC cannot do.

▮▮▮ The fiduciary nature of a broker-customer relationship is a factual issue. *Paine, Webber,* 718 P.2d at 515. Notably, in assessing whether control by a broker exists, "courts have not limited the scope of their vision to the documentation pursuant to which a customer's account is maintained, but instead have examined how account transactions have actually been conducted." *Id.* at 517.

> In certain circumstances, trust and confidence are so closely related to control that when a customer reposes such a degree of trust and confidence in a broker as to suggest a fiduciary relationship, the broker will almost invariably have functional control over the customer's account.... it is the ability to control transactions in the customer's account that gives rise to the need to provide those protections to the customer that inhere in recognition of fiduciary duties in the broker.

*Id.* at 518. I also note "[t]he existence of a fiduciary duty must be judged on the substance of a transaction, rather than on its form...." *Rupert v. Clayton Brokerage Co. of St. Louis,* 737 P.2d 1106, 1110 n. 2 (Colo. 1987).

Applying these principles to the record before me, genuine issues of material fact exist with regard to whether Refco had the ability to control transactions in JBT's or other Denman customer accounts. Summary judgment is therefore inappropriate on the issue of whether a fiduciary relationship existed between Refco and JBT.

### H. *Fraudulent Concealment.*

▮▮▮ The elements of fraudulent concealment are:

> (1) the defendant's concealment of a material existing fact that in equity or good conscience should be disclosed, (2) the defendant's knowledge that the fact is being concealed, (3) the plaintiff's ignorance of the fact, (4) the defendant's intent that the plaintiff act on the concealed fact, and (5) the plaintiff's action on the concealment resulting in damage.

*Burman v. Richmond Homes Ltd.,* 821 P.2d 913, 918 (Colo.App.1991). The duty to disclose does not depend on the existence of a fiduciary relationship between the parties. *Windon Third Oil & Gas Drilling Partner-*

*ship v. FDIC,* 805 F.2d 342, 347 (10th Cir. 1986), but arises "when one party has information that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Id.*

Refco argues there is no evidence of fiduciary relationship or other circumstances giving rise to a duty of disclosure by Refco to JBT, nor that it assumed any control or responsibility reposed by JBT. Because there is an issue of fact as to whether any Refco owed JBT a fiduciary duty, summary judgment cannot be considered on this claim.

### I. *Breach of Contract.*[22]

██ The elements for a breach of contract claim are: (1) the existence of a contract, (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff. *Western Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo.1992).

FDIC claims the following facts prove these elements: On or about February 9, 1990, JBT entered into a contract with RCC pursuant to a customer account application. As already discussed, the application provided either JBT's President, Grotjohn, or its accounting supervisor, Caldeira, was authorized to withdraw funds from the JBT account. FDIC asserts RCC repeatedly breached its contract with JBT by allowing Wymer to make unauthorized withdrawals from the JBT account at RCC, and seeks damages for this alleged breach.

Refco asserts it followed Wymer's instructions in transferring JBT's funds and claims FDIC is collaterally estopped from denying Wymer acted as JBT's agent and that transferring or otherwise dealing with JBT's funds was within the scope of Wymer's agen-

cy by reason of the findings of fact in *Lyons v. Jefferson Bank & Trust,* 793 F.Supp. 981, 985 (D.Colo.1992), *aff'd,* 994 F.2d 716 (10th Cir.1993). Refco also claims there are issues as to whether the customer account application was a contract, and, if so, whether it was breached; whether JBT clothed Wymer with actual or apparent authority to act on its behalf; whether JBT ratified Wymer's conduct in dealing with its funds and securities; and whether JBT is estopped by its practices and course of dealing from recovering any funds from Refco by reason of Wymer's acts.[23]

### (1) *Collateral Estoppel.*

██ Collateral estoppel, or issue preclusion, bars relitigation of an issue if "(1) the issue is identical to that actually adjudicated in a prior proceeding; (2) the party against whom estoppel is sought is a party or in privity with a party to the prior proceeding; (3) there was a final judgment on the merits; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior action." *S.O.V. v. People in Interest of M.C.,* 914 P.2d 355, 359 (Colo.1996); *see also Lombard v. Axtens (in re Lombard),* 739 F.2d 499, 502 (10th Cir.1984).

The doctrine is broader than that of res judicata because it applies to claims for relief different from those litigated in the first action, but narrower in that it applies only to issues actually litigated. *People in Interest of M.C.,* 914 P.2d at 358–59. It protects litigants from the expense and vexation attending multiple lawsuits, conserves judicial resources and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979).

---

22. The issue of summary judgment on FDIC's Seventeenth Claim for Relief for breach of contract against Refco is addressed in the briefs related to Refco's Motion for Summary Judgment and is also the subject of FDIC's Motion for Partial Summary Judgment and the Refco Entities' Cross–Motion for Partial Summary Judgment.

23. Refco also asserts FDIC has failed to sustain its burden of establishing this court's personal jurisdiction over it. Its previous challenge to personal jurisdiction was denied by Judge Babcock in a bench ruling on a motion to dismiss on February 9, 1996 wherein he concluded jurisdiction existed under Colorado's long-arm statute and that traditional notions of due process were not offended by subjecting Refco to the jurisdiction of this court.

Refco argues JBT is collaterally estopped from relitigating Wymer's status as its agent and is precluded, as a matter of law, from denying the scope of Wymer's authority included transferring and otherwise dealing with JBT's funds. It relies on Judge Babcock's ruling in *Lyons v. Jefferson Bank & Trust*, 793 F.Supp. at 985 where he found Wymer was JBT's agent with authority to transfer and otherwise deal with JBT's funds.

In *Lyons*, the Commissioner of Insurance for the State of Iowa sought to impose a constructive trust on funds in the amount of $43,173,614.13 which Wymer had caused to be transferred to JBT from RCC at JBT's request. Plaintiff's Proposed Findings of Fact, Conclusions of Law, and Order and Judgment in that case stated:

> Originally in March, 1988 and subsequently in December, 1989, defendant [JBT] also entered into investment management agreements with Wymer and his companies. By that agreement, Wymer had authority to trade and transfer funds and securities for defendant's benefit.

(Defs.' Ex. 30 at 24.) [24]

Following a court trial, Judge Babcock made findings of fact which incorporated the plaintiff's proposed finding that Wymer was JBT's "agent" and that transferring and otherwise dealing with JBT's funds was within the scope of Wymer's agency:

> In March, 1988 and subsequently in December, 1989, [JBT] also entered into investment management agreements with Wymer and his companies. By those agreements and through a course of conduct, Wymer had authority to trade and transfer funds and securities for defendant's benefit, including repurchase and

reverse repurchase transactions (financing arrangements).

*Lyons*, 793 F.Supp. at 984.

> However, Wymer was defendant's agent. His oral instructions to Refco Securities to place incoming notes into the State of Wyoming account superseded any instructions on the in-coming wire.

*Id.* at 985.

Because the resulting judgment in favor of Iowa Trust was affirmed by the Tenth Circuit and thus became final, Refco maintains FDIC is estopped from relitigating Wymer's status as JBT's agent and the related issue of Wymer's authority as JBT's agent to transfer and otherwise deal with JBT's funds.[25]

FDIC contends the doctrine does not apply because whether Wymer was JBT's agent and the scope of that agency was not "actually and necessarily" determined in *Lyons*. *See Harvey v. United Transp. Union*, 878 F.2d 1235, 1243 (10th Cir.1989) (citing *Montana*, 440 U.S. at 153, 99 S.Ct. at 973); *Restatement (Second) of Judgments*, §§ 27, 29 (1982). By signing the Pretrial Order and stating in its claims and defenses that it had entered into a management agreement with Wymer under which he was to advise and direct investments for JBT's benefit, FDIC asserts JBT effectively stipulated to these facts, which were then incorporated in the plaintiff's proposed findings of fact and in the court's findings. By JBT so stipulating, FDIC argues, JBT did not actually litigate the scope of the agency relationship with Wymer. *See Gall v. South Branch Nat'l Bank*, 783 F.2d 125, 127 (8th Cir.1986) (finding the doctrine of collateral estoppel had no application where the issue sought to be precluded in a subsequent proceeding had been determined by stipulation).

**24.** There is some confusion as to whether application of collateral estoppel is governed by federal or state law in successive diversity actions. *See Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1273 n. 3 (10th Cir.1995). In their briefs, the parties rely predominantly on the Colorado law of collateral estoppel. This accords with the implicit ruling in *Federal Insurance Co. v. Gates Learjet Corp.*, 823 F.2d 383, 386 (10th Cir.1987), that a federal court sitting in diversity applies state law in determining the collateral estoppel

effect of a prior federal court diversity judgment. The requirements for collateral estoppel under Colorado law appear to be substantially the same as under federal law.

**25.** This action is pursued in JBT's name by FDIC. It is undisputed that JBT is either a party to this proceeding or that FDIC, by stepping into JBT's shoes, is in privity with JBT for collateral estoppel purposes.

I am not persuaded that the issue of Wymer's authority was determined by stipulation in *Lyons*. The Pretrial Order on which FDIC relies noted the parties had not reached any stipulations regarding trial, nor was the existence of Wymer's agency status stipulated at trial. Although Iowa Trust submitted a proposed finding of fact at the end of the trial that Wymer had the authority to trade and transfer funds and securities for JBT's benefit, JBT did not propose any finding of fact pertaining to Wymer's status as its agent. The court made the findings mentioned above, namely that by agreements and through a course of conduct Wymer had authority to trade and transfer securities for JBT's benefit and Wymer was JBT's agent.

FDIC next argues the doctrine of collateral estoppel does not apply because Wymer's agency was not necessary to the judgment in *Lyons*. I disagree. The finding that Wymer was JBT's agent was integral to the decision of whether the plaintiff in *Lyons* had met its burden of tracing Iowa Trust monies from its custodial account with Bankers Trust to JBT. Had the court not found Wymer was JBT's agent, it could not have found that plaintiff had traced its money to JBT, nor that JBT as constructive trustee was an "innocent donee." *See Lyons*, 793 F.Supp. at 986–87.

I regard the key question, however, to be whether the finding that Wymer was JBT's agent, with authority to trade and transfer funds and securities on JBT's behalf, now precludes FDIC from litigating the issue of whether Wymer had the authority to withdraw funds from the RCC account. In this regard, FDIC relies on *Tamari v. Bache & Co. (Lebanon) S.A.L.*, where the court concluded it could not apply collateral estoppel because "no determination of the scope of the agency was made." 637 F.Supp. 1333, 1338 (N.D.Ill.1986).

At issue, however, is whether, by virtue of the customer account application which provided that Grotjohn or Caldeira were the only ones authorized to withdraw funds from the JBT account, RCC breached a contract with JBT by allowing Wymer to make withdrawals from the RCC account. To establish collateral estoppel, Refco would have to demonstrate that the *Lyons* court not only litigated the issue of whether Wymer was JBT's agent with the power to transfer and otherwise deal with JBT's funds, but also whether, where JBT made an account application authorizing only persons other than Wymer to withdraw funds from the account, Wymer nevertheless had the authority to make such withdrawals. This issue is narrower than the one of broad agency decided by Judge Babcock. For this reason, I conclude the four criteria for the application of collateral estoppel have not been met.

(2) *Wymer's Authority, Estoppel and Ratification.*

The existence and scope of an agent's authority are usually questions of fact. *Calabrese Foundation, Inc. v. Investment Advisors, Inc.*, 831 F.Supp. 1507, 1512 (D.Colo.1993). Here, material issues of fact exist concerning whether Wymer had actual and/or apparent authority to transfer and otherwise deal with JBT's funds. Related issues are whether FDIC by its practices and course of dealing over more than three years ratified Wymer's conduct and transactions and is therefore estopped from recovering any monies from Refco, and whether JBT's alleged losses occurred as a result of its own conduct and that of third parties rather than Refco's conduct.

FDIC contends none of the above is relevant because the parties' intent must be determined solely from the terms of the account application. The customer account application clearly and unambiguously sets forth the terms governing JBT's relationship with RCC and constituted their entire understanding.

In *Winchell v. Moffat County State Bank*, however, the Tenth Circuit recognized that agency and estoppel concepts must be assessed together with the contract governing the relationship between a depositor and its bank, because "[t]he factors of authorization and negligence are difficult to separate...." 307 F.2d 280, 281 (10th Cir.1962). FDIC distinguishes *Winchell* because it concerned a situation "where two innocent parties have both been deceived, [wherein] the loss must be borne by the one who primarily made the loss possible." *Id.* at 282. Refco cannot rely

on *Winchell*, it argues, because in failing to confirm Wymer's authority, violating the language of the customer account application and withholding monthly statements from JBT, it did not act as an "innocent party."

I find, however, the identity of the innocent party, is a fact question. A jury could reasonably conclude JBT was culpable in allowing Wymer to transact business in its account or in failing to detect that he was doing so.

FDIC also asserts Wymer's authority to direct trades in JBT's account at RSI did not confer a similar grant of authority as to RCC, but then argues Grotjohn did not know that there was more than one corporate entity with the name "Refco" in its title. If the latter is correct, there is no basis for FDIC's allegation that Wymer was authorized at RSI but not RCC. Material issues of disputed fact concerning Wymer's authority, estoppel and ratification clearly bar summary judgment on the breach of contract claim.

*J. Conversion.*

 Conversion consists of the wrongful deprivation of property which the plaintiff is entitled to possess. *Commercial Credit Corp. v. University Nat'l Bank*, 590 F.2d 849, 852 (10th Cir.1979). FDIC asserts Refco converted JBT's investment funds and securities by commingling them with funds and securities belonging to Wymer, Denman/ITM or other Wymer customers, by failing to deposit wire transfers into JBT's account at RCC or by allowing investment in and withdrawals from the RCC account without proper authorization. Refco also seeks judgment on this claim on grounds that FDIC cannot establish Refco was obligated to return to JBT the identical funds placed under Wymer's control.

Relying on *Johnson v. Studholme*, 619 F.Supp. 1347, 1350 (D.Colo.1985), where the court stated, "the black letter law is that

there can be no action for the conversion of money," *i.e.*, where there is no obligation to return identical money, but only a relationship of debtor and creditor, Refco argues no action for conversion of funds representing the indebtedness will lie against the debtor. In that case, the court held the receiver for a commodities fund operating a classic "Ponzi" scheme could not recover payments to investors in excess of their contributions on a theory of conversion, because once the fund had sent the money to an investor pursuant to a contract for investment it had no further possessory interest therein. *Id.* at 1351.

FDIC responds that several Colorado courts have upheld claims for conversion of money notwithstanding *Johnson*. In *Glenn Arms Associates v. Century Mortgage & Investment Corp.*, 680 P.2d 1315, 1317 (Colo. App.1984), the plaintiff paid a $25,000 deposit to one of the defendants with the understanding that it would be placed in an escrow account. The balance was instead transferred to various accounts including, the defendant's personal account. The appellate court affirmed the judgment on plaintiff's claim for conversion, holding the entire $25,-000 had been converted albeit at different times and in various amounts. Refco distinguishes *Glenn Arms* on the basis that it concerned a fund created by contract, which was to be placed in escrow where it was to remain until it was paid out pursuant to the contractual terms.[26]

Neither RSI nor RCC had any obligation to deliver identical funds to JBT, and FDIC cannot establish Refco was obligated to return the identical funds deposited. Rather, JBT intended the transferred funds to be disbursed from its accounts. Under these circumstances, there is no factual basis for a conversion claim, and summary judgment is appropriate on both the Sixteenth Claim for conversion and the Fifteenth for conspiring to commit or aiding and abetting conversion.

---

**26.** Refco similarly distinguishes *Cornelius v. Gerwin & Co.*, 642 P.2d 54 (Colo.Ct.App.1982) which concerned an action for conversion of a cashiers check rather than a deposit, *Standley v. American Auto. Insurance Co.*, 136 Colo. 70, 314 P.2d 696 (1957), which revolved around specific collections of COD payments which were to be remit-

ted to the consignors of merchandise, and *Republic of Haiti v. Crown Charters, Inc.*, 667 F.Supp. 839 (S.D.Fla.1987), where the court found the stolen money was specifically identifiable from the time it was embezzled until it was transferred to defendant's account.

### K. Alter-ego or Piercing the Corporate Veil.

"Absent circumstances justifying disregard of the corporate form, a parent company is treated as a legal entity separate from the subsidiary." *Skidmore, Owings & Merrill v. Canada Life Assurance Co.*, 907 F.2d 1026, 1027 (10th Cir.1990). The following factors apply in analyzing whether to disregard the corporate form:

"(1) The parent corporation owns all or majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) the parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation, and in the statements of its officers, 'the subsidiary' is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed."

*Skidmore*, 907 F.2d at 1027 (quoting *Lowell Staats Mining Co., Inc. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1262 (10th Cir.1989)) (quoting *Fish v. East*, 114 F.2d 177, 191 (10th Cir.1940)) (applying Colorado law). Not all of these factors need be present to pierce the corporate veil. *Lowell Staats*, 878 F.2d at 1263.

Judge Babcock held FDIC could seek to pierce the corporate veil and hold the Refco entities liable for each other's debts and obligations. *First Interstate Bank*, 937 F.Supp. at 1467. FDIC outlines evidence in its response brief which supports the well-pleaded allegations in the complaint relating to the factors relevant to piercing the corporate veil. (*See* Pl.'s Mem. Opp. Refco Defs.' Mot. Summ. J. at 165–173.) Under the circumstances, disputed issues of material fact preclude summary judgment on the alter-ego claim.

### V. FDIC's Motion for Partial Summary Judgment on Affirmative Defenses Five, Six, Seven, Eight, Nine, Ten, Thirteen, Fourteen, Fifteen, and Sixteen.

FDIC moves for summary judgment on the following affirmative defenses: Fifth (bar due to "plaintiff's negligence and/or intentional acts"); Sixth (estoppel); Seventh (waiver); Eighth (ratification); Ninth (laches); Tenth (bar due to alleged "negligence or culpable conduct of persons or entities other than [Refco]," to the extent such defense implicates the conduct of JBT or the FDIC); Thirteenth (failure to mitigate damages); Fourteenth (assumption of risk); and Fifteenth and Sixteenth (acts of Wymer were allegedly acts of JBT "and plaintiff is bound by the knowledge and conduct of Wymer and his companies"). It asserts these affirmative defenses are contrary to controlling state law in that they seek to impute the allegedly inequitable or culpable conduct of JBT to FDIC.

FDIC relies on the decision upon remand in *FDIC v. O'Melveny & Myers*, 61 F.3d 17, 18 (9th Cir.1995). There FDIC, as receiver for a failed savings and loan association, brought a professional malpractice action against the law firm which represented the savings and loan in a fraudulent private placement. Initially, in *FDIC v. O'Melveny & Meyers*, 969 F.2d 744, 752 (9th Cir.1992), *rev'd*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), the Ninth Circuit held allegedly culpable conduct of certain savings and loan officers could not be imputed to FDIC. This decision was based in part upon the invocation of "federal common law." *Id.* at 751–52.

The Supreme Court reversed, holding there generally is no "federal common law," nor any provision in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) which precludes a defendant in an action based on state law from asserting state law defenses against the FDIC as receiver. *O'Melveny & Myers v.*

*FDIC*, 512 U.S. 79, 86–87, 114 S.Ct. 2048, 2054–55, 129 L.Ed.2d 67 (1994). Federal courts must therefore decide the question of what defenses can be asserted against FDIC as receiver under state law. *Id.*

On remand, the Ninth Circuit reiterated its position that equitable defenses based upon the bank's inequitable conduct could not be asserted against the FDIC. *FDIC v. O'Melveny & Myers*, 61 F.3d at 18. It noted the general rule under California law that " 'a receiver occupies no better position than that which was occupied by the person or party for whom he acts ... and that any defense good against the original party is good against the receiver.' " *Id.* at 19 (quoting *Allen v. Ramsay*, 179 Cal.App.2d 843, 854, 4 Cal.Rptr. 575 (1960)). This rule was "subject to exceptions; defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver." *Id.*

The Ninth Circuit reasoned a receiver does not voluntarily step into the shoes of the bank but is rather "thrust into those shoes." *Id.* The receiver was neither a party to the inequitable conduct nor in a position to cure the defects or to force the bank to pay for incurable defects. It was also significant that the receiver became the bank's successor as part of a regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct. As such, "the scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets." *Id.*

 State law generally determines what defenses may be asserted against the FDIC as a receiver of an insolvent bank. *O'Melveny & Myers v. FDIC*, 512 U.S. at 84, 114 S.Ct. at 2053. FDIC maintains, relying predominantly upon *Gillett v. Moore*, 74 Colo. 484, 223 P. 21, 24 (1924), that inequitable or culpable conduct of an insolvent bank may not be imputed to FDIC as receiver and

affirmative defenses which seek to do so are not permitted.

In *Gillett*, a shareholder of an insolvent national bank sued the receiver to establish a preferred claim over general creditors for money he paid under an illegal assessment levied by the bank's board of directors. *Id.* 223 P. at 22. The Colorado Supreme Court noted the general rule that "a receiver takes the assets of an insolvent bank as a mere trustee of the creditors, and, in the absence of a statute to the contrary, subject to all claims and defenses that might have been interposed as against the insolvent corporation." *Id.* 223 P. at 24. In denying the shareholder's request, however, it reasoned that "any mistaken supposition by a shareholder in making such payments was not brought about by any misrepresentations, either of fact or law, on the part of the creditors for whose benefit the receiver was acting." *Id.* 223 P. at 25.[27]

FDIC contends it represents both the shareholders and the creditors of the failed bank. *See* 4B Colo.Rev.Stat. § 11–5–105(4) and (5) (1996); *FDIC v. American Cas. Co.*, 843 P.2d 1285, 1294 (Colo.1992). This dual capacity underlies the exception to the general rule that receivers stand in the shoes of the failed institution. *RTC v. Fleischer*, 890 F.Supp. 972, 981 (D.Kan.1995) rejected the affirmative defenses of ratification, waiver, and estoppel which sought to impute the failed institution's "actions or negligence" to the RTC. On this basis, FDIC asserts, I should disallow Refco's affirmative defenses which rely on imputing JBT's alleged conduct to FDIC.

Refco responds that under Colorado law, a receiver may assert the rights of the institution's creditors against a defendant, but only if the defendant owed some duty to the creditors. Only where such duty was owed is the conduct of the officers of the failed institution irrelevant to the determination of whether the defendant breached that duty.

Refco points out it owed no duty to JBT's creditors, nor does FDIC assert such a duty existed. FDIC's claims are based on a

---

**27.** FDIC also cites the related case of *Gillett v. Patterson*, 74 Colo. 501, 223 P. 27, 27–28 (1924) where the Colorado Supreme Court reversed the trial court's order and allowed the bank's receiver to collect on a shareholder's promissory note made in payment of the unlawful assessment.

breach of obligation to JBT itself, not to its creditors and FDIC stands in the shoes of and is subject to the same defenses as JBT.[28]

Refco maintains *Gillett v. Moore* offers no succor. There, as discussed above, the shareholder of an insolvent bank sued the receiver for recovery of an illegal assessment. Because the plaintiff in *Gillett* sought to establish a preferred claim over the bank's general creditors to the assets already held by the receiver, the creditor interests were directly at issue, unlike in the present case.

There is merit in this assertion. As pointed out in *Gillett*, the assessment the shareholder sought to recover had been to prevent and secure an exemption from involuntary liquidation. 223 P. at 24. If the rights of the general creditors were injuriously affected, they were not to be sacrificed to the interests of the shareholder for whose benefit the bank was permitted to do business during which time, and before the shareholder sought relief, the rights of the creditors attached. The assessment had been paid by the shareholder in the hope of continuing the business and saving its investment. "[A]ny mistaken supposition by a shareholder in making such payments was not brought about by any misrepresentations, either of fact or law, on the part of the creditors for whose benefit the receiver was acting." *Id.* 223 P. at 25.

*Gillett's* rationale has no application beyond its peculiar facts. FDIC's attempt to extrapolate that reasoning to the entirely different facts of this case is without basis. Here, Refco raises the conduct of JBT's officers not as a sword, but a shield. Nor does it attempt to establish a preferred claim over the bank's general creditors to the assets already held by the receiver. It raises affirmative defenses involving the alleged inequitable conduct of the officers of JBT in response to a complaint based on an alleged breach of obligation to JBT.

FDIC sues Refco in place of JBT, which, as a corporate institution, could only have acted through its officers and employees. To allow FDIC to put the conduct of JBT officers and employees in issue and use it as a

sword against third parties without allowing them to defend themselves by using that same conduct as a shield would controvert the time-honored principle of *audi alteram partem.*

FDIC also relies on *FDIC v. O'Melveny & Myers,* 61 F.3d 17 (9th Cir.1995), applying California law, and cites no Colorado case adopting the Ninth Circuit's decision. Nor do I find it persuasive. That court noted the FDIC as receiver was generally subject to any defense that existed against the original party but found that California law created an exception for defenses based on a party's unclean hands or inequitable conduct; *i.e.,* that such defenses do not apply against a receiver. In this regard, *O'Melveny* relied exclusively on *Camerer v. California Savings & Commercial Bank,* 4 Cal.2d 159, 48 P.2d 39 (1935). A review of *Camerer,* however, leads to a contrary conclusion.

There, plaintiff stored his bonds in a safe deposit box at the bank. When the bank became insolvent, its president used the bonds to bolster the bank's financial position. The bank failed and Camerer sued for the return of his bonds. The receiver attempted to rely on cases holding that, where a transfer of property of an insolvent bank constitutes a fraud on creditors, the receiver as the representative of the creditors can avoid it, even if the bank could not. *Id.* 48 P.2d at 44–45. The California Supreme Court disagreed, finding Camerer was not party to the bank president's unlawful conduct and had not practiced any fraud on the bank's creditors. *Id.* 48 P.2d at 45–48. Because the creditors had no defense to Camerer's claim, the receiver had only the rights of the failed bank and the court affirmed a judgment directing the bonds returned to Camerer. *Id.*

*Camerer* thus permits no exception to the general rule that a receiver occupies no better position than that which was occupied by the party for whom it acts. *O'Melveny's* conclusion that under California law the FDIC is not barred by certain equitable defenses is tenuous. Likewise, FDIC's reliance

---

**28.** The cases on which FDIC relies are distinguished as involving self dealing by officers and directors of a failing corporation who violated a

state-created fiduciary duty to its creditors. Under Colorado Law, there is no cause of action in favor of JBT's creditors and against Refco.

on *O'Melveny* and its perceived narrow exception under California law as authority for a broad exception under Colorado law is not compelling.

*RTC v. Fleischer*, 890 F.Supp. 972 (D.Kan. 1995), also relied on by FDIC, concerned a suit against the director of a failed bank. Notably, after the Supreme Court held there was no federal common law in *O'Melveny*, the Kansas court refused to revisit its previous holding that the conduct of a failed thrift's officers could not be imputed to the RTC, finding its previous decision (based on federal common law) to be the law of the case. Nevertheless, it permitted the defendant to "compare the fault of other directors to his own" and assert defenses of ratification, waiver and estoppel. *Fleischer*, 890 F.Supp. at 981.

In *FDIC v. Deloitte & Touche*, 834 F.Supp. 1129 (E.D.Ark.1992), FDIC alleged the directors of FirstSouth, a savings and loan association, had entered into imprudent transactions due to its auditors' failure to identify its poor condition. FDIC specifically alleged it brought the action as receiver "for the benefit of FirstSouth and its depositors and creditors." *Id.* at 1134. The defendants moved to dismiss the claims, arguing that FDIC could only represent the interests of the failed thrift. Under Arkansas law, the court held, an auditor owed no duty to third parties. Further, regardless of FDIC's power to bring suit for the benefit of First-South's depositors and creditors, it would not be able to distinguish itself from FirstSouth. *Id.* at 1136–37.

Similarly, in *FDIC v. Shrader & York*, 991 F.2d 216 (5th Cir.1993), *cert. denied*, 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994), FDIC brought a malpractice action against a law firm. The firm moved for summary judgment alleging that the conduct of the institution's officers should be imputed to the bank and therefore to FDIC. FDIC sought to distance itself from that conduct by arguing it was suing on behalf of the creditors and depositors.

The Fifth Circuit found there was no allegation or evidence that the depositors and creditors of the failed savings and loan associations were customers of the law firm, and

thus able to sue them for professional malpractice, and FDIC failed to explain how it improved its position by standing in the shoes of depositors and creditors. *Id.* at 223. Following *FDIC v. Ernst & Young*, 967 F.2d 166, 170 (5th Cir.1992), imputation of the officers' conduct to the bank and, therefore, to FDIC, was appropriate. *Shrader & York*, 991 F.2d at 223.

I find the reasoning in *Ernst & Young*, *Deloitte & Touche*, and *Shrader & York* fitting. I am not persuaded in the circumstances of this case that Refco should be precluded from asserting against FDIC defenses it could have asserted had JBT itself filed the action. FDIC has not shown such preclusion is appropriate based on the facts of this case under Colorado law. I therefore deny FDIC's partial motion for summary judgment on affirmative defenses five through ten and thirteen through sixteen.

## VI. *Refco's Cross–Motion to Bifurcate the Alter-ego Claims from the Main Action.*

 On January 29, 1996, FDIC filed a motion to compel Refco's answers to interrogatories and production of documents. On February 26, 1996, Refco filed a memorandum (a) in opposition to FDIC's motion to compel and (b) in support of its cross-motion to bifurcate the alter-ego claims from the main action.

In a March 7, 1996 Order, Magistrate Judge D.E. Abram, to whom the case was referred for the resolution of discovery issues, noted that the motion to bifurcate was pending before Judge Babcock. The magistrate judge ordered that the motion to compel, as it related to the alter-ego discovery, be held in abeyance pending the ruling on the bifurcation issue. On September 27, 1996, he noted that a California court in a related case had already ordered the material produced, and thus granted the motion to compel.

Refco seeks an order bifurcating further discovery relating to and trial of the alter-ego issue from discovery and trial of the main case, arguing the gravamen of FDIC's claims is that RSI and RCC improperly followed Wymer's instructions with respect to

JBT's accounts at those entities. There is no allegation JBT transacted any business with Refco, Inc. ("RI") or Refco Group, Ltd. ("RGL"), or that either RI or RGL engaged in any wrongful act with respect to JBT. Thus, FDIC only attempts to hold RI and RGL liable as alleged alter-egos of RSI and/or RCC. Refco denies any of these entities is an alter-ego of another, and asserts the issue of whether RSI or RCC have alter-egos is unrelated to any claim of their liability for the Wymer fraud, that discovery relating to the fraud is complete, and that the alter-ego issue should be bifurcated from the main issues for purposes of discovery and trial.

Rule 42(b) of the Federal Rules of Civil Procedure provides: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial ... of any separate issue...." "Bifurcation is not an abuse of discretion if such interests favor separation of issues and the issues are clearly separable." *Angelo v. Armstrong World Indus.,* 11 F.3d 957, 964 (10th Cir.1993). Bifurcation is an abuse of discretion, however, if it is unfair or prejudicial to a party. *Id.*

At this stage, discovery is complete and the case is ready to proceed to trial on all issues, including the alleged alter-ego relationship among the Refco entities. Notably, questions regarding piercing the corporate veil are to be decided by the court, rather than a jury. *Straub v. Mountain Trails Resort, Inc.,* 770 P.2d 1321, 1323 (Colo.Ct. App.1988), *cert. denied,* (March 13, 1989).

Because bifurcation of the alter-ego issue might further delay resolution of this case, I deny Refco's cross-motion on this issue.

### VII. *Refco's Motion for Rule 11 Sanctions.*

Refco moves for sanctions under Rule 11 of the Federal Rules of Civil Procedure against FDIC and its attorneys for submitting allegedly inaccurate, incomplete and misleading information in their August 14, 1996 response to Refco's motion for reconsideration of the order striking their designations of non-parties at fault. The chief assertions are that, as support for its claim that Refco participated in Wymer's fraud, FDIC and its counsel (1) referred to criminal information filed against Goodman but failed to reveal the information states she acted "without the knowledge of her employer [RSI]"; (2) referred to an SEC press release announcing a settlement with RSI but failed to inform the court that the settlement order does not allege Refco participated in Wymer's fraud; and (3) represented to the court that JBT and Grotjohn acted responsibly and were not negligent in aiding Wymer's scheme in reliance on the report of banking expert Ralph Mires, critical aspects of which were later recanted.

Under Rule 11, the person who signs a pleading, motion or other paper filed with the court, certifies he has conducted a reasonable inquiry into the factual and legal basis for the filing, and that the substance of the filing is well-grounded in fact and law. "Rule 11 neither penalizes overstatement nor authorizes an overly literal reading of each factual statement." *Navarro–Ayala v. Hernandez–Colon,* 3 F.3d 464, 467 (1st Cir.1993). "Rule 11 sanctions serve to punish a knowing filing of a false or misleading pleading." *Coffey v. Healthtrust, Inc.,* 1 F.3d 1101, 1104 (10th Cir.1993). The allegations in FDIC's opposition to the motion for reconsideration, although possibly overstated, do not rise (or fall) to this level.

"It is the obligation of counsel opposing the value of evidence, not the proponent, to expose weaknesses in evidence upon which an attorney relies for the filing of pleadings, motions and other papers." *Id.* at 1104–05. FDIC is not required to uncover and to set forth the facts that support Refco's position.

Moreover, I note the August 15, 1996 order denying Refco's motion for reconsideration was based upon the absence of an intervening change in controlling law, availability of new evidence, or need to correct clear error or prevent manifest injustice. Neither it nor the July 10, 1996 order striking Refco's designation was based upon any finding regarding Refco's role in the scheme or knowledge of the scheme.

For the aforesaid reasons, I deny Refco's motion for Rule 11 sanctions.

## VIII. *FDIC's Motion for Leave to Call Steven Seelig as a Fact Witness.*

██ FDIC requests an order granting leave to call Steven Seelig, the Deputy Director of its Division of Research, as a fact witness at trial. His proposed testimony concerns factual background about FDIC's role as receiver of insolvent banks and insurer of qualified deposits.

FDIC submits it is entitled to provide the jury with this background information, citing the Advisory Committee notes to Rule 401 of the Federal Rules of Evidence to the effect that "evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding." In addition to providing background testimony regarding FDIC's role, FDIC claims Seelig's proposed testimony regarding general policies and procedures concerning criminal referrals is independently relevant should Refco be permitted to admit evidence regarding the criminal referral the FDIC filed on Maurice Grotjohn, former president of JBT.

Refco submits Seelig should not be permitted to testify because no witness has ever mentioned his name in any deposition in this case, nor does it appear in any document produced by FDIC, nor did he participate in JBT's receivership. Moreover, Refco argues, because FDIC simply stands in JBT's shoes, testimony regarding its general policies and procedures is irrelevant. Refco asserts FDIC's true purpose in calling Seelig is to distance itself from the conduct of JBT's officers and wrap itself in the mantle of insurer and protector of the interests of depositors and consumers such as those who will sit as triers of fact.

Finally, Refco contends the time for identifying fact and expert witnesses is and was long past at the time the pretrial order was submitted. Permitting FDIC to name Seelig as a witness at this time will necessitate further depositions and defer the date and expand the scope of trial.

FDIC denies that Refco will be prejudiced by allowing Seelig to be a fact witness because there is no trial date at present and it has agreed to produce Seelig at Refco's offices in New York at FDIC's own expense. It also suggests, for the first time, that Refco could use the Office of the Inspector General Report on the failure of JBT to criticize FDIC's regulatory performance and to suggest FDIC is partially at fault for the damages it seeks to recover. In opposing the motion to file a reply brief, Refco reiterates FDIC's conduct is not and has never been an issue in this case.

I have already determined that Refco is not precluded from asserting against FDIC defenses it could have asserted had JBT itself filed the action. By implication, FDIC stands in the shoes of JBT. Seelig's proposed testimony would be irrelevant because it would not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Fed.R.Ev. 401. Moreover, even if relevant as background information, any probative value of Seelig's testimony would be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay [or] waste of time...." *See* Fed.R.Ev. 403.

Accordingly, I deny FDIC's Motion for Leave to Call Steven Seelig as a Fact Witness.

## IX. *Conclusion.*

I conclude that Colorado law applies to this case. Material issues of fact preclude Refco's motion for summary judgment on all claims on which it is sought, with the exception of the conversion claims. I grant summary judgment for Refco and against FDIC on the Fifteenth and Sixteenth claims for relief.

I deny the parties' cross-motions for partial summary judgment on the seventeenth claim for breach of contract, FDIC's partial motion for summary judgment on affirmative defenses five through ten and thirteen through sixteen, Refco's cross-motion to bifurcate the alter-ego claims, Refco's motion for Rule 11 sanctions, and FDIC's motion for leave to call Steven Seelig as a fact witness. Accordingly,

IT IS ORDERED THAT Colorado law applies to this case;

IT IS FURTHER ORDERED THAT Refco's Motion for Summary Judgment is DENIED with respect to all remaining claims with the exception of the Fifteenth and Sixteenth claims on which summary judgment is GRANTED against FDIC;

IT IS FURTHER ORDERED THAT the parties' cross-motions for partial summary judgment on the Seventeenth Claim are DENIED;

IT IS FURTHER ORDERED THAT FDIC's partial motion for summary judgment on affirmative defenses five through ten and thirteen through sixteen is DENIED;

IT IS FURTHER ORDERED THAT Refco's cross-motion to bifurcate the alter-ego claims is DENIED;

IT IS FURTHER ORDERED THAT Refco's motion for Rule 11 sanctions is DENIED; and

IT IS FURTHER ORDERED THAT FDIC's Motion for Leave to Call Steven Seelig as a Fact Witness is DENIED.